Ex Parte. In the Matter of the Commonwealth of Kentucky, one of the United States of America, by Beriah Magoffin, Governor, and the Executive Authority.thereof, Petitioner, *v.* William Dennison, Governor and Executive Authority of the State of Ohio.

1. In a suit between two States, this court has original jurisdiction, without any further act of Congress regulating the mode and form in which it shall be exercised.

2. A suit by or against the Governor of a State, as such, in his official character, is a suit by or against the State.

3. A writ of mandamus does not issue in virtue of any prerogative power, and, in modern practice, is nothing more than an ordinary action at law in cases where it is the appropriate remedy.

4. The words "treason, felony, or other crime," in the second clause of the second section of the fourth article of the Constitution of the United States, include every offence forbidden and made punishable by the laws of the State where the offence is committed.

5. It was the duty of the Executive authority of Ohio, upon the demand made by the Governor of Kentucky, and the production of the indictment, duly certified, to cause Lago to be delivered up to the agent of the Governor of Kentucky who was appointed to demand and receive him.

6. The duty of the Governor of Ohio was merely ministerial, and he had no right to exercise any discretionary power as to the nature or character of the crime charged in the indictment.

7. The word "duty," in the act of 1793, means the moral obligation of the State to perform the compact in the Constitution, when Congress had, by that act, regulated the mode in which the duty was to be performed.

8. But Congress cannot coerce a State officer, as such, to perform any duty by act of Congress. The State officer may perform it if he thinks proper, and it may be a moral duty to perform it. But if he refuses, no law of Congress can compel him.

9. The Governor of Ohio cannot, through the Judiciary or any other Department of the General Government, be compelled to deliver up Lago; and, upon that ground only, this motion for a mandamus was overruled.

A motion was made in behalf of the State of Kentucky, by the direction and in the name of the Governor of the State, for a rule on the Governor of Ohio to show cause why a mandamus should not be issued by this court, commanding him to cause Willis Lago, a fugitive from justice, to be delivered up, to be removed to the State of Kentucky, having jurisdiction of the crime with which he is charged.

*Commonwealth of Ky. v. Dennison, Governor, &c.*

The facts on which this motion was made are as follows:

The grand jury of Woodford Circuit Court, in the State of Kentucky, at October term, 1859, returned to the court the following indictment against the said Lago:

WOODFORD CIRCUIT COURT.

*The Commonwealth of Kentucky against Willis Lago, free man of color.*

The grand jury of Woodford county, in the name and by the authority of the Commonwealth of Kentucky, accuse Willis Lago, free man of color, of the crime of assisting a slave to escape, &c., committed as follows, namely: the said Willis Lago, free man of color, on the fourth day of October 1859, in the county aforesaid, not having lawful claim, and not having any color of claim thereto, did seduce and entice Charlotte, a slave, the property of C. W. Nuckols, to leave her owner and possessor, and did aid and assist said slave in an attempt to make her escape from her said owner and possessor, against the peace and dignity of the Commonwealth of Kentucky.        W. S. DOWNEY, *Com. Attorney.*

On the back of said indictment is the following endorsement:

"A true bill; L. A. Berry, foreman.  Returned by grand jury, October term, 1859."

A copy of this indictment, certified and authenticated, according to the act of Congress of 1793, was presented to the Governor of Ohio by the authorized agent of the Governor of Kentucky, and the arrest and delivery of the fugitive demanded.

The Governor of Ohio referred the matter to the Attorney General of the State of Ohio, for his opinion and advice, and received from him a written opinion, upon which he acted, and refused to arrest or deliver up the fugitive, and, with his refusal, communicated to the Governor of Kentucky the opinion of the Attorney General, to show the grounds on which he refused.   The written opinion of the Attorney General is as follows:

OFFICE OF THE ATTORNEY GENERAL,
*Columbus, Ohio, April* 14, 1860.

SIR: The requisition, with its accompanying documents,

made upon you' by the Governor of Kentucky, for the sur-
render of Willis Lago, described to be a "fugitive from the
justice of the laws of" that State, may, for all present pur-
pose, be regarded as sufficiently complying with the provis-
ions of the Federal Constitution and the act of Congress
touching the extradition of fugitives from justice, if the al-
leged offence charged against Lago can be considered as
either "treason, felony, or other crime," within the fair scope
of these provisions.

Attached to the requisition is an authenticated copy of the
indictment on which the demand is predicated; and this,
omitting merely the title of the case and the venue, is in the
words and figures following:

"The grand jury of Woodford county, in the name and by
the authority of the Commonwealth of Kentucky, accuse Wil-
lis Lago, free man of color, of the crime of assisting a slave to
escape, &c., committed as follows, viz: the said Willis Lago,
free man of color, on the fourth day of October, 1859, in the
county aforesaid, not having lawful claim, and not having any
color of claim thereto, did seduce and entice Charlotte, a
slave, the property of C. W. Nuckols, to leave her owner and
possessor, and did aid and assist said slave in an attempt to
make her escape from her said owner and possessor, against
the peace and dignity of the Commonwealth of Kentucky."

This indictment, it must be admitted, is quite inartificially
framed, and it might be found difficult to vindicate its validity
according to the rules of criminal pleading which obtain in
our own courts, or wheresoever else the common law prevails.
This objection, however, if it have any force, loses its import-
ance in the presence of other considerations, which, in my
judgment, must control the fate of the application.

The act of which Lago is thus accused by the grand jury of
Woodford county certainly is not "treason," according to any
code of any country, and just as certainly is not "felony," or
any other crime, under the laws of this State, or by the com-
mon law.   On the other hand, the laws of Kentucky do de-
nounce this act as a "crime," and the question is thus pre-
sented whether, under the Federal Constitution, one State is

under an obligation to surrender its citizens or residents to any other State, on the charge that they have committed an offence not known to the laws of the former, nor affecting the public safety, nor regarded as *malum in se* by the general judgment and conscience of civilized nations.

This question must, in my opinion, be resolved against the existence of any such obligation. There are many acts—such as the creation of nuisances, selling vinous or spirituous liquors, horse racing, trespassing on public lands, keeping tavern without license, permitting dogs to run at large—declared by the laws of most of the States to be crimes, for the commission of which the offender is visited with fine or imprisonment, or with both; and yet it will not be insisted that the power of extradition, as defined by the Constitution, applies to these or the like offences. Obviously a line must be somewhere drawn, distinguishing offences which do from offences which do not fall within the scope of this power. The right rule, in my opinion, is that which holds the power to be limited to such acts as constitute either treason or felony by the common law, as that stood when the Constitution was adopted, or which are regarded as crimes by the usages and laws of all civilized nations. This rule is sufficiently vindicated by the consideration that no other has ever been suggested, at once so easy of application to all cases, so just to the several States, and so consistent in its operation with the rights and security of the citizen.

The application of this rule is decisive against the demand now urged for the surrender of Lago. The offence charged against him does not rank among those upon which the constitutional provision was intended to operate, and you have, therefore, no authority to comply with the requisition made upon you by the Governor of Kentucky.

Entertaining no doubt as to the rightfulness of this conclusion, I am highly gratified in being able to fortify it by the authority of my learned and eminent predecessor, who first filled this office, and who officially advised the Governor of that day, that in a case substantially similar to the one now presented, he ought not to issue his warrant of extradition.

Other authority, if needed, may be found in the fact that this rule is conformable to the ancient and settled usage of the State.

To guard against possible misapprehension, let me add that the power of extradition is not to be exercised, as of course, in every case which may apparently fall within the rule here asserted. While it is limited to these cases, the very nature of the power is such, that its exercise, even under this limitation, must always be guided by a sound legal discretion, applying itself to the particular circumstances of each case as it shall be presented.

The communication, in a formal manner, of the preceding opinion, has been long but unavoidably deferred by causes of which you are fully apprised. Though this delay is greatly to be regretted, it can have had no prejudicial effect, as the agent appointed by the Governor of Kentucky to receive Lago was long since officially, though informally, advised that no case had been presented which would warrant his extradition.

Very respectfully, your obedient servant,

                                        C. P. WOLCOTT.

To the Governor.

Some further correspondence took place between the Governors, which it is not necessary to state; and the Governor of Ohio, having finally refused to cause the arrest and delivery of the fugitive, this motion was made on the part of Kentucky.

Upon the motion being made, the court ordered notice of it to be served on the Governor and Attorney General of Ohio, to appear on a day mentioned in the notice. The Attorney General of Ohio appeared, but under a protest, made by order of the Governor of Ohio, against the jurisdiction of the court to issue the mandamus moved for.

The case was fully argued by *Mr. Stevenson* and *Mr. Marshall* on behalf of the State of Kentucky, and by *Mr. Wolcott,* the Attorney General of Ohio, on the part of that State.

The great importance of the principles involved in this case

has induced the reporter to allow a large space to the arguments of the respective counsel.

That of *Messrs. Cooper* and *Marshall* and *Mr. Stevenson*, for the State of Kentucky, was as follows:

The State of Kentucky, interested in the preservation of the integrity of her own laws, and in the punishment of such as offend against them on her own soil, comes, as a party plaintiff in this proceeding, before the Supreme Court of the United States, as a court of original jurisdiction, to ask for a mandamus against Mr. Dennison, who is the Governor of Ohio, and as such, exercises the Executive authority of said State.

The second paragraph of section 2, article 4, of the Constitution of the United States, reads thus;

"A person charged in any State with treason, felony, or other crime, who shall flee from justice and be found in another State, shall, on demand of the Executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime."

To execute this obligation of the Constitution the act of Congress of 1793 was passed, (Statutes at L., 302, sec. 1,) in which, by the first section, the duty to be performed, and the person by whom to be performed, in the event of a demand under the Constitution, are prescribed. That duty is simple, and is stated thus:

"It shall be the duty of the Executive authority of the State or Territory to which such person shall have fled, to cause him or her to be arrested and secured, and notice of the arrest to be given to the Executive authority making such demands, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear."

One Lago, who was indicted for an act denounced as a crime by the law of Kentucky, fled, and was found in Ohio, and was demanded by Governor Magoffin, the Executive authority of the State of Kentucky, of Governor Dennison, the Governor of Ohio, and at the time Executive authority thereof. All the conditions were observed to complete a proper demand, ac-

cording to the act of Congress. It is further shown that, for reasons set forth in the official reply of Governor Dennison, as Executive authority of Ohio, the demand was not complied with, and that he refused to arrest Lago at all. Upon that refusal this proceeding is taken.

The Commonwealth of Kentucky is properly the plaintiff in this case.

"Where an application is made, the object of which is to obtain the benefit of certain provisions of an act of Parliament, &c., those for whose benefit such provisions were inserted in the act, &c., should be the applicants for the rule, although they may be neither specially nor nominally mentioned."

Tapping on Mandamus, 289.

The duty prescribed by the Constitution and law was to have been performed by the defendant, Dennison, as the officer wielding the Executive authority of the State of Ohio. He is, therefore, the proper person against whom to institute the proceeding.

Is mandamus the proper remedy? We will not extend this brief by reciting what is said of the authority of the Court of B. R. over mandamus. It has been used since the days of Edward II, in England, and has been the suppletory police power of the kingdom.

Tapping on Mandamus, 5—30.

Cowp., 378; 2 B. and C., 198.

Burrows, 1265—'68.

15 East., 135.

3 Blacks. Com., 110.

In this court it is acknowledged as an action, a case, rather than as a "prerogative writ."

The proceeding on mandamus is a case within the meaning of the act of Congress. It is an action or suit brought in a court of justice, asserting a right, and is presented according to the forms of judicial proceeding.

12 Peters, 614; 2 Peters, 450.

It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the pro-

priety or impropriety of issuing a mandamus is to be determined.

1 Cranch, 170.

This court (in 3 Howard, 99) treats the mandamus as "an action," and that "a party is entitled to it when there is no other adequate remedy." This court refuses to entertain the action of assumpsit for matter which might have been proved on a former action of mandamus.

There is no remedy for the grievance inflicted on the State of Kentucky by the refusal of Governor Dennison, unless the mandamus applied for will lie. If mandamus will lie in any case where the Supreme Court exercises original jurisdiction, all considerations and conditions concur to point it out as the proper remedy in this case; for—

1. The duty to be performed is single, simple, only ministerial and public in its nature and office.

2. The party directed to perform it is certainly named.

3. No other adequate remedy exists or is prescribed by law.

4. The duty is distinctly prescribed by the Constitution and the act of 1793.

5. The office held by Mr. Dennison does not shield him from the performance; "it is the nature of the duty which determines the propriety of mandamus as a remedy."

The Supreme Court of the United States has never adjudicated the question of this remedy as now it is presented.

In the case of the United States *v.* Lawrence, 3 Dallas, 53, (A. D. 1795,) this court was applied to as a court of original jurisdiction, and it entertained the jurisdiction. The case was disposed of on the point, that the duty of Judge Lawrence involved the exercise of a discretion in the execution of his office which this court could not control.

In the case of Marbury *v.* Madison, 1 Cranch, 175, a careful reading of the opinion will show that the mandamus was refused because the act of 1789 was unconstitutional, in so far as it disturbed the constitutional distribution of the judicial power of this court. The application was to this court, in its original jurisdiction, whereas the case belonged to it only

under its appellate jurisdiction, and therefore the rule was discharged. ·

. In McIntyre *v.* Wood, 7 Cranch, 504, the point was as to the power of the Circuit Court of the United States; and the same remark applies to the case of McCluney *v.* Silliman, 6 Wheat., 600. The reasoning of those cases is sufficiently satisfactory, but it has no application in this case.

Ex parte Roberts, 6 Peters, 216, and Ex parte Davenport, 6 Peters, 664, were applications to control the judge of an inferior court by mandamus, which were refused because of the discretion the inferior officer had the right to exercise. Ex parte Bradstreet, 8 Peters, 634, and Ex parte Story, 12 Peters, 339, were cases addressed to this court, in the exercise of its appellate jurisdiction; so was the case of Kendall *v.* United States, which was very elaborately argued, 12 Peters, 525 to 655. Ex parte Guthrie, and all the rest of the cases of the applications for mandamus, have been to this court as an appellate court. This is the first case in our judicial history in which a mandamus has been asked for in a case falling properly within the original jurisdiction of the Supreme Court.

The judicial power of the United States is vested, by the Constitution, in the Supreme Court, and in such inferior courts as Congress may from time to time establish. This power "shall extend" to a number of classes of cases, among which are "all cases in law or equity arising under this Constitution, the laws of the United States," &c., &c., and, within the enumerated classes, "in all cases in which a State shall be · a party, the Supreme Court shall have original jurisdiction.

It is respectfully submitted that, under these constitutional grants of power and jurisdiction, this court may, *debito justitiæ,* entertain the application for mandamus where a State is a party, and this without resort to the act of Congress distributing the means of enforcing the jurisdiction. The judicial power, so far as this jurisdiction of the court is concerned, is vested by the Constitution; it would neither remain dormant, nor would it expire, though the Legislative power had never passed a law to authorize certain processes to assert such jurisdiction. We adopt the view taken by the counsel in the case of the

United States *v.* Peters, 3 Dallas, 126: "The judicial power is abstract or relative; in the former character, the court, for itself, declares the law and distributes justice; in the latter, it superintends and controls the conduct of other tribunals by a prohibitory or mandatory interposition. This superintending authority has been deposited in the Supreme Court by the Federal Constitution, and it becomes a duty to exercise it upon every proper occasion." "It is certain the Constitution fixes no limitation to the exercise of this power by this court upon the subject; nor does the law, but by the implication in the 14th section of the act of 1789, that the writs issued shall be allowable by principle and usage," and necessary to the exercise of the jurisdiction belonging to the court. If mandamus would then be granted by the Court of King's Bench, *debito justitiæ*, it can be issued in a case of original jurisdiction, upon a proper showing, by this court; and the express power is extended by the 14th section of the judiciary act of 1789, if the writ is necessary to the exercise of the jurisdiction belonging to the court.

If mandamus should not be regarded as a "prerogative writ," but as an action, a case, it falls, in this matter, directly within the vested power and original jurisdiction of the court, and can be entertained independently of the judiciary act, as a constitutional "power" of this court.

Where is the great conservative power which is to regulate State sovereignties in the execution of their constitutional obligations, if this court renounces, or shrinks from, the legitimate exercise of the functions with which it is invested by the Constitution?

The original jurisdiction of this court is limited to those cases in which foreign ambassadors, ministers, consuls, and American States, are interested; but in this range it has no limit. There is no judge who can interpose to exercise power over them but this court, in its original jurisdiction. From the very nature of the Constitution, the great police power of the mandamus, as between the States, is a necessity to the exercise of the jurisdiction conferred on this court. Therefore, Kentucky approaches this tribunal with the violated

obligation of Ohio in one hand, and with the Constitution in the other, conferring full jurisdiction on this court, as a court of original jurisdiction in all cases in law or equity in which a State is a party, and shows that, for the grievance she suffers, there is no legal remedy but mandamus.

"It is the case which gives the jurisdiction, not the court." 1 Wheat., Martin *v.* Hunter's Lessee.

Under the precepts of the law of nations, the obligation to deliver fugitives from justice touched only a few classes of criminals—those whose crimes "touched the State," or were so enormous as to make them *hostes humani generis*—poisoners, assassins, &c. These were delivered up, when convicted or tried, and sometimes before. This was done for comity. Vattel, Book 1, c. 19; B. 2, c. 6.

The character of this obligation was more frequently rendered certain by treaty, as in our treaties with Great Britain and France. But the Constitution of the United States has, among the States of the Union, extended and enlarged the rule of the publicists. Whereas they obeyed the demand in cases of criminals "convicted or tried," our States obey the demand where a person is charged with treason, felony, or other crime; whereas they only obeyed the demand in cases of heinous crimes, our States enter into the obligation for "other crime," making their obligation as broad as the word crime can be extended. Crime can be extended in its signification. Crime is synonymous with misdemeanor, (4 Black. Com., 5,) and includes every offence below felony punished by indictment as an offence against the public, (9 Wendell, 222.) We know that, in the first draft of this clause of the Constitution, the words "high misdemeanor" were used. They were stricken out, and "other crime" inserted, because "high misdemeanor" might be technical and too limited. The framers wanted "to comprehend all proper cases." (5 Elliott, 487.) To use the language of a learned judge, "there is a dependence that justice will be done; and the Constitution rests on this confidence for the vindication of the compact for 'a more perfect Union.'"

The Constitution reposes in the Federal Government the

discretion of conducting the foreign intercourse of these States with foreign Powers. This is manifest by the power given to the Executive "to receive ambassadors, public ministers, and consuls, and, by and with the consent of the Senate, to appoint ambassadors and other public ministers, and consuls," and, by and with the consent of the Senate, to make treaties. The correlative inhibitions to the States are expressed in the same instrument: "No State shall enter into any treaty, alliance, or confederation." Article 1, section 10: "No State shall enter into any agreement with a foreign Power," &c. This court has coincided with the view here expressed, in the opinion rendered in the case of Holmes *v.* Jennison, 14 Pet., 575. A Governor of one of these United States cannot surrender a fugitive from justice from a foreign country to the agents of that Power. This is exclusively within the sphere of the Federal Power. *Ib.*

The Constitution is harmonious in its complicated structure. As the Federal Government is the repository of the power over foreign intercourse, so the inter-State intercourse is established upon a fixed and stable basis, by dispensing with comity and the rule of the publicists, and making the obligation to render criminals to the jurisdiction they have offended a perfect obligation, in express constitutional compact. The States have left themselves no discretion on this subject. They cannot enlarge, diminish, abridge, or modify, the constitutional arrangement: "No State shall, without the consent of Congress, enter into any agreement or compact with another State," &c.

Congress cannot waive an express and mandatory provision of the Constitution. A person charged with treason, felony, or other crime, &c., shall be delivered up, &c. Can two of these States negotiate with each other a modification of this obligation? Certainly not. Can they with the consent of Congress? Certainly not. It is a fixed, well-defined, and perfect obligation, which furnishes all the essentials for its own execution, if properly considered, as an inter-State obligation, subject to the Judicial branch of the Government to enforce its due and proper execution. It expresses plainly

what is to be done, upon whose demand it is to be done, the circumstances under which it is to be done, and the purpose for which it is to be done. By whom it is to be done, the Constitution did not prescribe; for, it may be, that was a matter in which the State might have a choice. Congress acted; yet the Executive of the State was left to be guided by his State authority or his own responsibility as to the mode in which he would cause the arrest and delivery of the fugitive; but, beyond this simple and single ministerial performance, the Constitution and the law have left him no discretion whatever. He is a mere instrument of the Constitution, pointed out by the law, because he holds the Executive authority of his State, and is a sworn officer of the Constitution of the United States, bound by his oath to observe its mandates, and the laws of the United States made in pursuance thereof, as the supreme law of the land, even in preference to those of his own State. The Executive authority of the State was indicated, because the duty to be performed was of a very delicate nature, and a discourteous exhibition of power within the demesnes of a State was to be avoided, such as arresting one, without regular process, who might be within the protection of the State.

It would not be within the right or competency of the State of Ohio to refuse this delivery. All her departments could not make a law effective to prevent it. Can her Executive alone avoid it? If he can, why may not any one else, no matter how appointed or in what way qualified? Another could not be qualified by a stronger oath to support the Constitution, and the laws of the United States made in pursuance of it; for the Constitution requires this Executive to take that oath, and qualifies his right to the gubernatorial chair of his State by the fact of his taking or refusing to take that oath. Were he to refuse, as Governor of Ohio, to take the oath to support the Constitution of the United States, and to maintain the laws made in pursuance thereof, is there no power, by mandamus, in the Judicial Department of this Government, to compel obedience to a duty expressed on the face of the Constitution?

Commonwealth of Ky. v. Dennison, Governor, &c.

The State of Ohio must be considered as yet willing to abide by her constitutional obligation, for this refusal is not the act of the Government of the State; it is only the act of her Executive, of one department of her Government. The State is bound so strongly by the terms of the Constitution, she cannot refuse. If, then, she is consenting, and Kentucky is demanding, and only Mr. Dennison refusing, it remains to be seen whether there resides in the Judicial Department of the Federal Government power to compel him to the performance of a ministerial duty assigned to him by law, in order to execute the inter-State covenants inscribed in the Constitution. In that memorable case of Prigg *v.* Pennsylvania, (16 Pet., 539,) several leading principles of construction were asserted, to the observance of which we now invite the attention of this court.

1. When the end is required, the means are given; when the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is intrusted.

2. The General Government is bound, through its own departments, Legislative, Judicial, or Executive, as the case may be, to carry into effect all the rights and duties imposed upon it by the Constitution.

We are perfectly aware that reliance may be placed on the very case from which these principles are extracted, to prove that the obligation to deliver the fugitive from justice is "exclusively Federal," and that, therefore, it may be insisted that Congress cannot direct a State Executive authority to execute it, but must impose this duty on some person who will be amenable, as belonging to one of the departments of the Federal Government: The court says the obligation is "exclusively Federal"—that "the States cannot be compelled to enforce it." From this *dictum* the inference is drawn that, if the person indicated to perform the duty, (though it be only ministerial,) holds any office under the State Government, this court cannot or will not compel him to perform the duty, but will wait for Congress to remodel the legislation of 1793, so as to make the person exclusively a Federal officer. We resist the propriety of such inference from the points decided

by the court in Prigg's case. The court alluded to the resort which the claimant of a fugitive from service must have to the Judiciary to ascertain a fact, in order to support a right upon the finding of the fact, and did intimate that the action of the State magistracy was voluntary, though valid, unless prohibited by the State. In the case of a fugitive from justice, however, there is no fact to be ascertained, no question to be adjudicated, no necessity to appeal to any one to support a right, but simply to deliver upon a demand. Will it be replied that, to afford even this facility, Congress must, by law, indicate who is to perform the duty? We rejoin, that Congress has so indicated by the act of 1793. As well might the defendant plead his citizenship or inhabitancy in Ohio to relieve him, as that he is relieved by being Governor, or holding an office by authority of the State. The power of this Government extends so far that the performance of a public duty may be demanded, and the incumbent of a particular office may be required to perform it, especially where the duty is only ministerial, though at the same time he may be in office in the State. We think it is eminently proper that the Executive authority of the State should be the power indicated for the performance of this duty; because that officer is, at the same time, sworn to support the Constitution of the United States, and the laws of Congress made in pursuance thereof; and because he represents the State on which the demand is made, and is bound by the constitutional compact on which the demand is founded.

The obligation is said to be "exclusively Federal." Does it not bind the State of Ohio? Is it not from her power the compact subtracts? We think the State has peculiarly come under the obligation expressed in the clause in question. Her hands are tied by the clause. Without the clause she might have been guided by her own discretion or by comity; now she is obliged, by the terms of the covenant to which she has consented. It may be she cannot be compelled to enforce the delivery of the fugitive; it may be the General Government is compelled, through its own departments, "to carry this into effect;" but that necessity does not shift the obligation.

The citizen owes obedience to the law, and is under obligation to perform the duties the law enjoins; but, if he fails, the court enforces the law, and secures the right which was infringed by the violation of the duty. Nothing can be more familiar than an obligation resting upon one party, and the right and power to enforce its execution vested in another. We submit, very respectfully, that this is just the case under our Constitution. The obligation to surrender the fugitive from justice rests upon the State; the power and duty to enforce the obligation reside in the General Government. The State of Virginia failing in 1790 to deliver certain fugitives upon the demand of Governor Mifflin, of Pennsylvania, he brought the facts before the President, and the act of 1793 was the consequence, whereby the Executive of the State was directed to perform the duty answering such demand. Every condition has been met. They who would escape the conclusion at which we wish to arrive must take the position not only that, in our system, the States may prohibit the use of their State agencies to the General Government in carrying the supreme law into effect within their boundaries, but this further position, that it is not in the power of the Federal Government to demand of any one in a State to perform a duty essential to the execution of the obligations inscribed in the Constitution.

We may well ask the Supreme Court to pause before ruling to this extent. When we remember that all Executive, Legislative, and Judicial officers, in the several States, are required, by the express letter of the Constitution of the United States, to be sworn "to support the Constitution," and that "the laws of Congress made in pursuance thereof are the supreme law of the land," overriding all State laws coming into conflict with them—that this body of State officers is bound solemnly to render obedience primarily to this supreme law, even in their respective jurisdictions, and though opposed to their State laws—it is difficult to comprehend the wisdom of that policy which teaches that those States can prohibit the use of these agencies in carrying into effect those very laws which the State has consented to observe as the supreme law, and its

agents have been sworn to support as paramount. It seems to us that the policy leads to a multiplication of officers, thus increasing the burdens of the people, and to conflicts between State and Federal agencies, by inculcating the idea that there is an incompatibility in the exercise of official fidelity to the State and Federal jurisdictions at the same time. Under our system of government, administered in its true spirit, there never can be a conflict. It is pernicious to the best interests to build on this foundation, for "a house divided against itself will fall." The State functionary owes allegiance and obedience to the Constitution of the United States, and the laws made in pursuance thereof, before everything else. The State owes the same obedience and observance to the same power. The Constitution enters and pervades our system everywhere. It surrounds the States and the people like an atmosphere vital to them, and ever in contact with them. To the officials of States, in every department of State Government, it is ever present with the oath to be rendered for its support, to remind them that, while they perform the functions of a limited jurisdiction, they are at the same time the conservative sentinels of that larger system, whose forces control the course and destiny of their State and of their fellow-citizens. The planet of the heavens revolves upon its own axis, and pursues its peculiar orbit; but it, and all who inhabit it, are at the same time particles of an infinite system, whose balanced and regulated forces acting upon it assure its safety, and preserve it from destructive collision with the spheres that surround it. The planet and its inhabitants are not taught that they cannot obey the laws of the Great Architect and Ruler.

The Constitution of the United States engages three articles in asserting the construction of its departments of Government, defining their powers, and prohibiting the exercise of these to the States. So precise is it, that no restraint is laid upon a State but that an examination will prove it is because the same power vested in the new Government. With the 4th article a new class is entered upon; they are not powers, but obligations and compacts, in which it is impossible to understand anything else (as it seems to us) than that the States

are bound *inter se*, and are understood to be actors. They are a class of cases to be rendered effective by the action of the States, and by the action of the General Government—concurrent powers. The rule is well settled that in such cases, when Congress acts, the rule it establishes obtains.

We submit to the court that the case of Prigg *v.* Pennsylvania has been modified by the subsequent decision of Moore *v.* the People of Illinois, (14 Howard,) so far at least as to authorize State legislation, which is ancillary to the effectuation of the obligation to be "carried into effect" by the Federal power. We hope the court will not carry the exclusive action of the Federal power so far as to say that it cannot indicate "the Executive authority of a State" as the instrument to perform the purely ministerial act required by the 2d section, 4th article, of the Constitution.

We refer, especially, to the opinion of Justice McLean in Prigg's case, because it is directly in line with the views we now present, and seems to us to be conclusive.

The duty required of the Governor of Ohio, in arresting a fugitive from justice, results from an express obligation of his State, which he, as the Executive authority of that State, is directed by the act of seventeen hundred and ninety-three to carry out. He has no judgment to exercise touching the point of arrest. He cannot even hear a question on the point of identity of person, that a judge might hear on *habeas corpus.* He cannot consider the question of guilt or innocence.

9 Wendell, 221.

We refer to Clark's case because it is a strong case, adjudicated in the better days of the Republic by a patriotic public officer, who strove only to perform his duty under the law.

May every State Executive at pleasure violate the Constitution in its most direct mandates, and most express obligations? Has the Judicial power an arm not strong enough to reach him? If so, the obligations of the Constitution may at any time and under any pretext be avoided; the instrument is a myth.

Governor Dennison has mistaken his power in this matter, by assuming the discretion to judge in regard to the alleged

crime. The words of the Constitution are unambiguous. That the crime is to be judged by the law of the State through whose Executive the demand is made, appears from the Constitution itself, for the object of the delivery of the fugitive is, "that he may be removed to the State having jurisdiction of the crime." To say that the authority on whom the demand is made shall judge of the guilt of the party, or of the fact of the crime, or whether the alleged act is a crime, is to nullify the sense, object, and intent, of the framers of the Constitution, and to assume a supervisory power by the Executive of a State over the law-making and police powers of another State. The police power of the States was reserved, and has never been surrendered to the Federal Government.

Moore *v.* the People of Illinois, 14 Howard, 18.

11 Pet., 139.

The Governor of Ohio, in refusing the demand, has not denied his general responsibility, under the Constitution and law of the United States, to make delivery of a fugitive from justice. His refusal was based upon the allegation that the offence charged in the Kentucky indictment was not crime, according to the signification of that word in the Constitution, and that therefore there was no obligation to deliver arising under the compact, nor springing from comity, because the offence was not known to civilized nations generally, to the common law, or to the statutes or polity of Ohio. In the views we have submitted already as to the duty of Governor Dennison, these positions are controverted. To confine the term to such offence as was denominated crime at the date of the Constitution, would give a restricted operation to the instrument, which would vastly impair its adaptation to the progress and wants of society. It would, in effect, destroy the force of this clause of the Constitution at its inception, and, instead of placing the States in bonds of mutual obligation to vindicate the jurisdiction of each other through future years, would make each a supervisor of the police power of the others, and, by reason of conflicting policies in their progress, would inevitably lead to alienation, confusion, and ultimate discord. "The instrument was not intended to provide

merely for the exigencies of a few years, but was to endure through a lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. * * * Hence its powers are expressed in general terms," &c.

1 Wheat., 305, 326.

The instrument was intended not only for those who framed it, but for posterity; not merely for the society of 1787, but for American society in all future time, and embraced in the word "crime" not merely what was punishable by indictment at the date of the instrument, but whatever each State in its progress might so declare. If this be not true, this family of American States are not connected by links stronger than a rope of sand. We will not elaborate this point further in this place, but may, if deemed proper, dwell upon it hereafter, together with reference to such works as will justify the views we suggest.

It only remains for the counsel for the demandant to say that the State of Kentucky, in bringing this case before the Supreme Court, pursues the law as it exists, and asks its enforcement, if the law can be enforced. If the act of Congress has exceeded the power vested in Congress by the Constitution, and we have been, since 1793, acting through instruments over which the Government has no control, Kentucky desires, through the Supreme Court, to know the fact, so that Congress may, without delay, so treat this important subject as hereafter to assure the faithful and prompt execution of this clause of the Constitution. To her it is a vital question; as to all the other States, in fact, whose institutions are similar to hers.

The argument of *Mr. Wolcott*, on behalf of the State of Ohio, was as follows:

I. The Government of the United States is one of limited and enumerated powers, derived primarily from the specific grants of the Constitution, which is at once the source and the law of all its being. It is a necessary correlative of this proposition, and one declared by the fundamental law itself, that each State still retains complete, exclusive, and supreme

power, over all persons and things within its limits, where that power has not been specially granted or restrained by the Constitution; and that, in respect to all this mass of undelegated and unprohibited power, the States stand to each other and to the General Government as absolutely foreign nations.

Gibbons *v.* Ogden, 9 Wheat., 203—208.
Brown *v.* Maryland, 12 Wheat., 419, 443.
Wilson *v.* Blackbird Creek Co., 2 Peters, 251, 252.
Buckner *v.* Finley, 2 Peters, 586, 590.
New York *v.* Miln, 11 Peters, 102, 139.
United States Bank *v.* Daniel, 12 Peters, 32, 34.
Rhode Island *v.* Massachusetts, 12 Peters, 720.
License Cases, 5 How., 504, 588.

II. The Judicial Department of the Federal Government, sharing of necessity the intrinsic quality which marks that Government in its unity, is also one of limited and specific powers, and, in its tribunals of every grade, is subject to three conditions of universal application:

1. *Ex vi termini*, it is confined to the discharge of functions purely judicial in their nature.

Hayburn's Case, *in notis*, 2 Dall., 409.

2. These functions can be exerted only in the precise cases enumerated by the Constitution as subject to the judicial authority, and which, it has been said, range themselves in two general classes:

*a.* Cases in which the authority depends on the nature of the controversy, without respect to the character of the parties; and—

*b.* Cases in which the authority depends on the character of the parties, without regard to the nature of the controversy.

Cohens *v.* Virginia, 6 Wheat., 264, 293.

But this is evidently to be taken as subject to another qualification; for—

3. The judicial power exercised in these specific cases must be the "judicial power of the United States." In other words, the authority of the Judicial Department is restrained not only by the limitations specially affixed to it, but also by those more general considerations which grow out of the very na-

ture and purpose of a Federal Government. Thus the judicial power of the United States cannot extend to a controversy in which a State may, even by a purely civil action, pursue a citizen of another State for his violation of its municipal laws. Though in that instance the controversy would, as to its subject-matter, be one proper for judicial cognizance, in the general sense of that term, and would also, in respect of its parties, fall within the enumerated cases, yet no tribunal of the United States could entertain it, because all matters of merely internal concern have been kept by the States for their own original, exclusive, and sovereign control.

New York City *v.* Miln, 11 Pet., 139.

License Cases, 5 How., 588.

III. The Supreme Court of the United States, while fettered by each of the conditions so attaching to the whole Judicial Department—of which it is simply the highest organ—has been otherwise so narrowly confined as to permit it to wield, in an original form, only a very scant degree of the scant power confided to the range of the Judicial Department. The Constitution assumed the existence of, but did not create this tribunal, and it delineated the outlines of the judicial authority with which it might or should be endowed. Of necessity, all judicial power must be exerted in an original or appellate form, and the Constitution has declared the precise cases in which, under either of these forms, the judicial power of the United States may be imparted to the Supreme Court.

The orginal jurisdiction, (and the present inquiry concerns that alone,) thus permitted to it, is expressly limited to—

1. Cases "affecting ambassadors, other public ministers, or consuls;" and—

2. Cases "in which a State shall be a party," and, since the adoption of the eleventh amendment, in which a State shall be the plaintiff, or other pursuing party. This means, that a State, in its sole corporate capacity, shall be the "entire prosecuting party on the record," with a *persona standi in judicio* of its own—a direct legal or equitable right pertaining to it, as a distinct unity. It is not enough that it may be "consequentially affected or indirectly interested."

Fowler *v.* Lindsay, 3 Dall., 411.

United States *v.* Peters, 5 Cranch, 115, 139.

Osborne *v.* United States Bank, 9 Wheat., 738, 850—857.

United States Bank *v.* Planters' Bank, 9 Wheat., 904, 906.

Wheeling Bridge Case, 13 How., 518, 559.

IV. The Constitution does not, of itself, vest any power of action in the Supreme Court. It simply enables the court, under the regulating control of Congress, to exert judicial authority in the prescribed cases; but the existence in the court of the power itself, and the methods and instruments of its exercise, depend on the affirmative legislative action of Congress. The Supreme Court, in respect of both forms of its jurisdiction, is the organ of the Constitution and the law.

Chisholm *v.* Georgia, 2 Dall., 419, 432, 452.

Marbury *v.* Madison, 1 Cranch, 137, 173.

Bollman's Case, Ex parte, 4 Cranch, 75, 93, 94.

Wayman *v.* Southard, 10 Wheat., 1, 21, 22.

New York *v.* New Jersey, 5 Pet., 284, 290.

Crane's Case, Ex parte, 5 Pet., 190, 193.

Rhode Island *v.* Massachusetts, 12 Pet., 657, 721, 722.

Kendall *v.* United States, 12 Pet., 524, 622.

Christie's Case, Ex parte, 3 How., 293, 322.

The Congress, exercising its power in this behalf, has regulated the jurisdiction of this court, and its forms and mode of proceeding. These regulations, so far as they bear upon the present purpose, are substantially as follows:

1. The original cognizance of this court, as to cases in which a State is a party, has been limited to "controversies of a civil nature"—a limitation not expressed by the Constitution, and yet certainly effectual.

Judiciary Act, sec. 13.

2. Power has been given to the Supreme Court to issue two named writs: the writ of prohibition to a named court, for a named purpose; and the "writ of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States."

Judiciary Act, sec. 13.

The general authority to regulate its modes of proceeding conferred on this court by the "process act," (sec. 2,) and to issue "other writs," ancillary to the exercise of its jurisdiction, conferred by the judiciary act, (sec. 14,) does not enable the court to enlarge the uses of the writ of mandamus. The process act expressly shuts out from its operation "the forms of proceeding," which "are provided for by the judiciary act;" and the judiciary act, in terms, limits the court to the issue of "such other writs" as are "not specially provided for by statute." Moreover, on settled and necessary principles, the express grant of this writ, as against a specific class of functionaries—otherwise within the scope of its most ordinary uses, and to whom, as of course, it would run, without distinct grant, if the court had a general authority to employ it—is a clear exclusion of any such authority, and an emphatic prohibition against the use of the writ in any other case, for any other purpose.

Christie, Ex parte, 3 How., 293, 322.

V. Arranging, in continuous order, the ascertained general conditions which limit the existence and exercise of the original jurisdiction of the Supreme Court in all possible cases, except only those "affecting ambassadors, other public ministers, and consuls," of whom there is now no question, it will be seen that no controversy can gain a foothold here, unless it be—

1. Appropriate for the action of judicial, as distinguished from political power.

2. Within the scope of "the judicial power of the United States," as distinguished from the general mass of judicial power reserved by and to the several States for their own exclusive exercise.

3. Instituted by a State, as the "entire party" plaintiff on record, in virtue of such direct legal or equitable interest in the subject-matter as, according to the ordinary rules applied to other parties, entitles it to "move" a case at law, or in equity, against a party subject to the control of the court.

4. Of a "civil" as opposed to one of a criminal "nature;" and—

5. Conducted in a form of proceeding consistent with its subject-matter, with the character of its parties, and with the regulations prescribed by Congress for the use of that form of proceeding.

But the controversy, if a writ of mandamus can be so called, moved for by the present application, has no one of all these vital characteristics; for—

VI. The subject-matter of the controversy excludes it from discussion or adjudication by any judicial tribunal.

1. It is not appropriate for the action of judicial power, since it only concerns the execution of a compact between States—independent as to each other—for the extradition of fugitive offenders. Affecting the States at large as to their exterior relations, and their reciprocal national rights and duties, it is, in essence, a political question. Without express provision, committing them, under specific regulations, to the judicial authority, the performance of national engagements addresses itself to the department wielding the political power, and able to weigh political considerations. No such valid provision has been made in respect of this compact.

Marbury *v.* Madison, 1 Cranch, 137, 170.

United States *v.* Palmer, 3 Wheat., 610, 634, 670.

The Divina Pastora, 4 Wheat., 52, 63.

Foster *v.* Neilson, 2 Peters, 253, 307, 314.

Cherokee Nation *v.* Georgia, 5 Peters, 1, 20.

United States *v.* Arredondo, 6 Peters, 691, 735.

2. If fit for judicial cognizance under any circumstances, or by any tribunal, the subject of the proceeding is, nevertheless, not within the scope of the judicial power of the United States.

*a.* The Constitution has not granted any power to any department of the Federal Government concerning the reclamation of fugitives from justice, as between the States. The provision which it contains in this behalf is a simple engagement made by the States with each other, regulating matters of purely State concern, and addressed to the States alone.

If, as an original question, this interpretation could be doubted, it has become the fixed one by long usage and acquiescence. Since the foundation of the Government, each State has habitually determined for itself the extent of this obligation; many of them (and Kentucky is one, 1 Stanton's Rev. Stat., 557) have regulated its discharge by express enactment; but never, until now, has the authority of the Federal Government been invoked to constrain its fulfilment. This practical exposition, acted upon for nearly eighty years, is too strong and obstinate to be shaken or controlled.

*Note.*—Upon this ground, as well as another, yet to be noticed, the act of Congress relating to fugitives from justice is clearly void. No inference of power in the Federal Government over this subject can be drawn from acquiescence in its provisions, for the act, in defining the cases to which it extends, follows the precise language of the stipulation itself, and, in terms, leaves its execution wholly to the authorities of the States themselves. The States, doubtless, have generally observed the rules it declares for the mere manner of surrender; not, however, as having the force of law, but by reason of their inherent fitness and convenience.

VII. The proceeding is not one in which a State is the pursuing party on the record; nor is any State so interested in its subject-matter as to be entitled to pursue here any form of controversy in respect to it; nor is the adversary party one over whom this court can, under any circumstances, or by any mode, exercise any control.

1. The writ of mandamus—as will hereafter more distinctly appear—is a prerogative writ, issued by the Government, in its own name, to its own functionaries, to redress or prevent a wrong done or threatened to itself as a Government. Awarded upon this ground and for this purpose, the Government is, of necessity, the prosecutor on the record. The relator is no "party" to the writ, and the writ constitutes the whole "case," or "controversy." If granted in this case, it will be a proceeding instituted by "The United States of America" against "The Governor of Ohio." Though the State of Kentucky may be interested in the performance of that duty,

yet the writ will issue upon reasons of public policy, simply t.j constrain the discharge of a public duty, imposed by the authority of the General Government, and essential to its own peculiar welfare. But if the applicant for the writ can be deemed the prosecuting party of record, still—

2. The Commonwealth of Kentucky has not such an interest in the discharge of the asserted duty as entitles her to set the writ in motion. The ground on which it must base its interest in the extradition of Lago is simply one phase of that general obligation, springing out of the social compact itself, which binds every organized political community to avenge all injuries aimed at the being or welfare of its society. Certainly, this is the first and highest of all governmental duties; but nevertheless it is, in juridical language, a "duty of imperfect obligation," incapable in its essence of precise exposition or admeasurement, and its fulfilment depends on moral and social considerations, accosting the community at large, which a judicial tribunal can neither weigh, define, nor enforce. But if there be any such right in this behalf as may constitute a foundation for legal proceedings to enforce it, then—

3. The claim made for the surrender of Lago must be prosecuted by the Executive authority, *eo nomine*, of the Commonwealth of Kentucky. That "authority" alone is empowered by the Constitution to demand the extradition, and, by parity of reason, can alone institute proceedings for its enforcement. But a suit by or against a State functionary, as such, is not a suit by or against the State itself.

Osborne *v.* United States Bank, 9 Wheat., 852, 859.

United States Bank *v.* Planters' Bank, 9 Wheat., 904.

4. The official personage against whom the writ is prayed is not subject, in any form or degree, to the jurisdiction of this court. The proceeding is against him in his official character and respects his official duty; so that if from any cause the present incumbent of the office should, prior to the execution of the writ, be divested of his official position, the writ itself would, in the same instant and *ex necessitate rei*, fall impotent— a mere *brutum fulmen*. The proceeding, then, is aimed at the

*Commonwealth of Ky.* v. *Dennison, Governor, &c.*

supreme Executive of the State of Ohio, to "coerce" the exercise of one of its imagined functions. But no power has been confided to any Department of the Federal Government to impose a duty upon any functionaries of a State, or to constrain the discharge of their official concerns.

Martin *v.* Hunter's Lessee, 1 Wheat., 304, 336.

Houston *v.* Moore, 5 Wheat., 1, 21, 22.

Prigg *v.* Pennsylvania, 16 Peters, 539.

*Note.*—Upon this ground, also, the act of Congress relating to fugitives from justice, which speaks only to State authorities, is void.

VIII. The controversy raised by the motion is not of a civil nature. It involves no question of the rights of person or the rights of property. The power of the court is invoked simply in aid of the administration of the criminal code of Kentucky, to the end that she may be able to try Lago for an imputed offence against her laws, and, if guilty, to imprison him in her penitentiary.

IX. The original jurisdiction of this court cannot be exercised through the method of the writ of mandamus; and this disability springs as well from the inherent nature of the writ itself as from the regulations prescribed for its use by the Legislative power.

1. The nature and functions of the writ are so peculiar as to forbid its employment, save for a single purpose, by any of the courts of the United States. The writ comes to us from the common law; and this court has judicially determined that the common-law remedies in the Federal tribunals are to be according to the principles of that law as settled in England, (Campbell *v.* Robinson, 3 Wheat., 221,) subject, of course, to the modifications made by Congress, or under its authority, and also to such limitations as result from the constitution of the court and the nature of the Federal Government. According to these principles, this writ, as tersely defined by Lord Mansfield, is "a high prerogative one, flowing from the King himself, sitting in the Court of King's Bench, superintending the police, and preserving the peace of the country.'

Rex *v.* Barker, 1 Bl. Rep., 300, 352.

Stated in a different form, the writ at common law is issued by a tribunal in which not only the judicial sovereignty, but the prerogative of general superintendency resides, and it is employed extra-judicially (Audley *v.* Jay, Popham, 176) as well as judicially. Its judicial use is to supervise the administration of the King's justice by his inferior judicatures; and its extra-judicial function is "to preserve peace, order, and good government," by constraining the prompt and rightful performance of every public duty confided to any public func tionary or tribunal by "Parliament or the King's Charter."

Tapping on Mandamus, S. 6, 11, 12.

Bacon's Ab. Tit. Mandamus, A.

Butler's Nisi Prius, 195.

Rex *v.* Baker, 3 Burr, 1266.

Rex *v.* Bank of England, 2 Barn. and Ald., 622.

Rex *v.* Fowey, 2 Barn. and Cr., 596.

Rex *v.* North Riding, 2 Barn. and Cr., 290.

Rex *v.* E. C. Railway, 10 Ad. and El., 557.

Kendall *v.* United States, 12 Peters, 621.

But this court is one of very special and limited jurisdiction. The judicial sovereignty, in its general sense, does not reside here; and it has no prerogative power, no police power, no power to superintend the conduct of public affairs. All its attributes are purely judicial; and from its very constitution, the power to issue this writ, in the large sense of the common law, cannot be given to this court. Of necessity, it can employ the writ only in its judicial operation, and as a revisionary process directed to some inferior judicature charged with the administration of the justice of the Federal Government. Otherwise stated, the court cannot, under the Constitution, be empowered to issue the writ of mandamus, save to the inferior judicatures of the United States, in the exercise of its appellate jurisdiction.

Marbury *v.* Madison, 1 Cranch, 137, 176.

Kendall *v.* United States, 12 Peters, 524, 621.

2. The judicial act, as already noticed, in regulating the conditions under which the great common-law writs may be issued by this court, has interdicted the employment of this

writ, except as it may, agreeably to "the principles and usages of law," be directed against "courts appointed, or persons holding office, under the authority of the United States." (Sec. 13.) In effect, however, the power to issue the writ is not co-extensive with even the narrow boundaries so prescribed. For the court, considering the validity of this provision, and recognising the incompatibility of any of the common-law functions of the writ with the limited and peculiar nature of its original power, has solemnly determined that the Constitution prohibits it from issuing the writ, except to the courts of the Federal Government, in the exercise of its appellate jurisdiction.

Marbury *v.* Madison, 1 Cranch, 137, 176.

Kendall *v.* United States, 12 Peters, 524, 621.

But the party against whom the writ is now invoked does not come within either of the categories prescribed by the judicial act. The Governor of Ohio is not a "court appointed, or a person holding office, under the authority of the United States."

X. The results now attained demonstrate that the controversy which the present application seeks to inaugurate is, in its form and in its essence, in its whole and in its every part and element, beyond the utmost sweep of the jurisdiction of this court. The power to compose this national and political strife does not reside in this tribunal; the pursuing party cannot cross its threshold; the party pursued is without the reach of its arm; the subject of the difference has been excluded from its action; and the writ which it is solicited to grant has been denied to it as a method for the exercise of its original jurisdiction.

Mr. Chief Justice TANEY delivered the opinion of the court.

The court is sensible of the importance of this case, and of the great interest and gravity of the questions involved in it, and which have been raised and fully argued at the bar.

Some of them, however, are not now for the first time brought to the attention of this court; and the objections made to the jurisdiction, and the form and nature of the process to

be issued, and upon whom it is to be served, have all been heretofore considered and decided, and cannot now be regarded as open to further dispute.

As early as 1792, in the case of Georgia *v.* Brailsford, the court exercised the original jurisdiction conferred by the Constitution, without any further legislation by Congress, to regulate it, than the act of 1789. And no question was then made, nor any doubt then expressed, as to the authority of the court. The same power was again exercised without objection in the case of Oswold *v.* the State of Georgia, in which the court regulated the form and nature of the process against the State, and directed it to be served on the Governor and Attorney General. But in the case of Chisholm's Executors *v.* the State of Georgia, at February term, 1793, reported in 2 Dall., 419, the authority of the court in this respect was questioned, and brought to its attention in the argument of counsel; and the report shows how carefully and thoroughly the subject was considered. Each of the judges delivered a separate opinion, in which these questions, as to the jurisdiction of the court, and the mode of exercising it, are elaborately examined.

Mr. Chief Justice Jay, Mr. Justice Cushing, Mr. Justice Wilson, and Mr. Justice Blair, decided in favor of the jurisdiction, and held that process served on the Governor and Attorney General was sufficient. Mr. Justice Iredell differed, and thought that further legislation by Congress was necessary to give the jurisdiction, and regulate the manner in which it should be exercised. But the opinion of the majority of the court upon these points has always been since followed. And in the case of New Jersey *v.* New York, in 1831, 5 Pet., 284, Chief Justice Marshall, in delivering the opinion of the court, refers to the case of Chisholm *v.* the State of Georgia, and to the opinions then delivered, and the judgment pronounced, in terms of high respect, and after enumerating the various cases in which that decision had been acted on, reaffirms it in the following words:

"It has been settled by our predecessors, on great deliberation, that this court may exercise its original jurisdiction in

suits against a State, under the. authority conferred by the Constitution and existing acts of Congress. The rule respecting the process, the persons on whom it is to be served, and the time of service, are fixed. The course of the court, on the failure of the State to appear after due service of process, has been also prescribed."

And in the same case, page 289, he states in full the process which had been established by the court as a rule of practice in the case of Grayson *v.* the State of Virginia, 3 Dall., 320, and ever since followed. This rule directs, "that when process at common law, or in equity, shall issue against a State, the same shall be served upon the Governor or chief Executive magistrate and the Attorney General of such State."

It is equally well settled, that a mandamus in modern practice is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. It undoubtedly came into use by virtue of the prerogative power of the English Crown, and was subject to regulations and rules which have long since been disused. But the right to the writ, and the power to issue it, has ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It was so held by this court in the cases of Kendall *v.* United States, 12 Pet., 615; Kendall *v.* Stokes and others, 3 How., 100.

So, also, as to the process in the name of the Governor, in his official capacity, in behalf of the State.

In the case of Madraso *v.* the Governor of Georgia, 1 Pet., 110, it was decided, that in a case where the chief magistrate of a State is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely in his official character, the State itself may be considered a party on the record. This was a case where the State was the defendant; the practice, where it is plaintiff, has been frequently adopted of suing in the name of the Governor in behalf of the State, and was indeed the form originally used, and always recognised as the suit of the State.

Thus, in the first case to be found in our reports, in which a suit was brought by a State, it was entitled, and set forth in

the bill, as the suit of "the State of Georgia, by Edward Tell
fair, Governor of the said State, complainant, against Samuel
Brailsford and others;" and. the second case, which was as.
early as 1793, was entitled and set forth in the pleadings as
the suit of "His Excellency Edward Tellfair, Esquire, Gov-
ernor and Commander-in-chief in and over the State of Geor-
gia, in behalf of the said State, complainant, against Samuel
Brailsford and others, defendants."

The cases referred to leave no question open to controversy,
as to the jurisdiction of the court.   They show that it has been
the established doctrine upon this subject ever since the act
of 1789, that in all cases where original jurisdiction is given
by the Constitution, this court has authority to exercise it
without any further act of Congress to regulate its process or
confer jurisdiction, and that the court may regulate and mould
the process it uses in such manner as in its judgment will best
promote the purposes of justice.   And that it has also been
settled, that where the State is a party, plaintiff or defendant,
the Governor represents the State, and the suit may be, in
form, a suit by him as Governor in behalf of the State, where
the State is plaintiff, and he must be summoned or notified as
the officer representing the State, where the State is defendant.
And further, that the writ of mandamus does not issue from
or by any prerogative power, and is nothing more than the
ordinary process of a court of justice, to which every one is
entitled, where it is the appropriate process for asserting the
right he claims.

We may therefore dismiss the question of jurisdiction with-
out further comment, as it is very clear, that if the right
claimed by Kentucky can be enforced by judicial process, the
proceeding by mandamus is the only mode in which the ob-
ject can be accomplished.

This brings us to the examination of the clause of the Con-
stitution which has given rise to this controversy.   It is in the
following words:

"A person charged in any State with treason, felony, or
other crime, who shall flee from justice, and be found in an-
other State, shall, or demand of the Executive authority of the

State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime."

Looking to the language of the clause, it is difficult to comprehend how any doubt could have arisen as to its meaning and construction. The words, "treason, felony, or other crime," in their plain and obvious import, as well as in their legal and technical sense, embrace every act forbidden and made punishable by a law of the State. The word "crime" of itself includes every offence, from the highest to the lowest in the grade of offences, and includes what are called "misdemeanors," as well as treason and felony.

4 Bl. Com., 5, 6, and note 3, Wendall's edition.

But as the word crime would have included treason and felony, without specially mentioning those offences, it seems to be supposed that the natural and legal import of the word, by associating it with those offences, must be restricted and confined to offences already known to the common law and to the usage of nations, and regarded as offences in every civilized community, and that they do not extend to acts made offences by local statutes growing out of local circumstances, nor to offences against ordinary police regulations. This is one of the grounds upon which the Governor of Ohio refused to deliver Lago, under the advice of the Attorney General of that State.

But this inference is founded upon an obvious mistake as to the purposes for which the words "treason and felony" were introduced. They were introduced for the purpose of guarding against any restriction of the word "crime," and to prevent this provision from being construed by the rules and usages of independent nations in compacts for delivering up fugitives from justice. According to these usages, even where they admitted the obligation to deliver the fugitive, persons who fled on account of political offences were almost always excepted, and the nation upon which the demand is made also uniformly claims and exercises a discretion in weighing the evidence of the crime, and the character of the offence. The policy of different nations, in this respect, with the opinions of eminent writers upon public law, are collected in Wheaton

on the Law of Nations, 171; Fœlix, 312; and Martin, Vergè's edition, 182. And the English Government, from which we have borrowed our general system of law and jurisprudence, has always refused to deliver up political offenders who had sought an asylum within its dominions. And as the States of this Union, although united as one nation for certain specified purposes, are yet, so far as concerns their internal government, separate sovereignties, independent of each other, it was obviously deemed necessary to show, by the terms used, that this compact was not to be regarded or construed as an ordinary treaty for extradition between nations altogether independent of each other, but was intended to embrace political offences against the sovereignty of the State, as well as all other crimes. And as treason was also a "felony," (4 Bl. Com., 94,) it was necessary to insert those words, to show, in language that could not be mistaken, that political offenders were included in it. For this was not a compact of peace and comity between separate nations who had no claim on each other for mutual support, but a compact binding them to give aid and assistance to each other in executing their laws, and to support each other in preserving order and law within its confines, whenever such aid was needed and required; for it is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government; and that nothing would be more likely to disturb its peace, and end in discord, than permitting an offender against the laws of a State, by passing over a mathematical line which divides it from another, to defy its process, and stand ready, under the protection of the State, to repeat the offence as soon as another opportunity offered.

Indeed, the necessity of this policy of mutual support, in bringing offenders to justice, without any exception as to the character and nature of the crime, seems to have been first recognised and acted on by the American colonies; for we find, by Winthrop's History of Massachusetts, vol. 2, pages 121 and 126, that as early as 1643, by "articles of Confedera-

tion between the plantations under the Government of Mas sachusetts, the plantation under the Government of New Ply mouth, the plantations under the Government of Connecticut, and the Government of New Haven, with the plantations in combination therewith," these plantations pledged themselves to each other, that, upon the escape of any prisoner or fugitive for any criminal cause, whether by breaking prison, or getting from the officer, or otherwise escaping, upon the certificate of two magistrates of the jurisdiction out of which the escape was made that he was a prisoner or such an offender at the time of the escape, the magistrate, or some of them, of the jurisdiction where, for the present, the said prisoner or fugitive abideth, shall forthwith grant such a warrant as the case will bear, for the apprehending of any such person, and the delivery of him into the hands of the officer or other person who pursueth him; and if there be help required for the safe returning of any such offender, then it shall be granted unto him that craves the same, he paying the charges thereof." It will be seen that this agreement gave no discretion to the magistrate of the Government where the offender was found; but he was bound to arrest and deliver, upon the production of the certificate under which he was demanded.

- When the thirteen colonies formed a Confederation for mutual support, a similar provision was introduced, most probably suggested by the advantages which the plantations had derived from their compact with one another. But, as these colonies had then, by the Declaration of Independence, become separate and independent sovereignties, against which treason might be committed, their compact is carefully worded, so as to include treason and felony—that is, political offences—as well as crimes of an inferior grade. It is in the following words:

"If any person, guilty of or charged with treason, felony, or other high misdemeanor, in any State, shall flee from justice, and be found in any other of the United States, he shall, upon demand of the Governor or Executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of his offence."

And when these colonies were about to form a still closer union by the present Constitution, but yet preserving their sovereignty, they had learned from experience the necessity of this provision for the internal safety of each of them, and to promote concord and harmony among all their members; and it is introduced in the Constitution substantially in the same words, but substituting the word "crime" for the words "high misdemeanor," and thereby showing the deliberate purpose to include every offence known to the law of the State from which the party charged had fled.

The argument on behalf of the Governor of Ohio, which insists upon excluding from this clause new offences created by a statute of the State, and growing out of its local institutions, and which are not admitted to be offences in the State where the fugitive is found, nor so regarded by the general usage of civilized nations, would render the clause useless for any practical purpose. For where can the line of division be drawn with anything like certainty? Who is to mark it? The Governor of the demanding State would probably draw one line, and the Governor of the other State another. And, if they differed, who is to decide between them? Under such a vague and indefinite construction, the article would not be a bond of peace and union, but a constant source of controversy and irritating discussion. It would have been far better to omit it altogether, and to have left it to the comity of the States, and their own sense of their respective interests, than to have inserted it as conferring a right, and yet defining that right so loosely as to make it a never-failing subject of dispute and ill-will.

The clause in question, like the clause in the Confederation, authorizes the demand to be made by the Executive authority of the State where the crime was committed, but does not in so many words specify the officer of the State upon whom the demand is to be made, and whose duty it is to have the fugitive delivered and removed to the State having jurisdiction of the crime. But, under the Confederation, it is plain that the demand was to be made on the Governor or Executive authority of the State, and could be made on no other depart

-ment or officer; for the Confederation was only a league of separate sovereignties, in which each State, within its own limits, held and exercised all the powers of sovereignty; and the Confederation had no officer, either executive, judicial, or ministerial, through whom it could exercise an authority within the limits of a State. In the present Constitution, however, these powers, to a limited extent, have been conferred on the General Government within the territories of the several States. But the part of the clause in relation to the mode of demanding and surrendering the fugitive is, (with the exception of an unimportant word or two,) a literal copy of the article of the Confederation, and it is plain that the mode of the demand and the official authority by and to whom it was addressed, under the Confederation, must have been in the minds of the members of the Convention when this article was introduced, and that, in adopting the same words, they manifestly intended to sanction the mode of proceeding practiced under the Confederation—that is, of demanding the fugitive from the Executive authority, and making it his duty to cause him to be delivered up.

Looking, therefore, to the words of the Constitution—to the obvious policy and necessity of this provision to preserve harmony between States, and order and law within their respective borders, and to its early adoption by the colonies, and then by the Confederated States, whose mutual interest it was to give each other aid and support whenever it was needed—the conclusion is irresistible, that this compact engrafted in the Constitution included, and was intended to include, every offence made punishable by the law of the State in which it was committed, and that it gives the right to the Executive authority of the State to demand the fugitive from the Executive authority of the State in which he is found; that the right given to "demand" implies that it is an absolute right; and it follows that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or laws of the State to which the fugitive has fled.

This is evidently the construction put upon this article in

the act of Congress of 1793, under which the proceedings now before us are instituted. It is therefore the construction put upon it almost cotemporaneously with the commencement of the Government itself, and when Washington was still at its head, and many of those who had assisted in framing it were members of the Congress which enacted the law.

The Constitution having established the right on one part and the obligation on the other, it became necessary to provide by law the mode of carrying it into execution. The Governor of the State could not, upon a charge made before him, demand the fugitive; for, according to the principles upon which all of our institutions are founded, the Executive Department can act only in subordination to the Judicial Department, where rights of person or property are concerned, and its duty in those cases consists only in aiding to support the judicial process and enforcing its authority, when its interposition for that purpose becomes necessary, and is called for by the Judicial Department. The Executive authority of the State, therefore, was not authorized by this article to make the demand unless the party was charged in the regular course of judicial proceedings. And it was equally necessary that the Executive authority of the State upon which the demand was made, when called on to render his aid, should be satisfied by competent proof that the party was so charged. This proceeding, when duly authenticated, is his authority for arresting the offender.

This duty of providing by law the regulations necessary to carry this compact into execution, from the nature of the duty and the object in view, was manifestly devolved upon Congress; for if it was left to the States, each State might require different proof to authenticate the judicial proceeding upon which the demand was founded; and as the duty of the Governor of the State where the fugitive was found is, in such cases, merely ministerial, without the right to exercise either executive or judicial discretion, he could not lawfully issue a warrant to arrest an individual without a law of the State or of Congress to authorize it. These difficulties presented themselves as early as 1791, in a demand made by the Governor

of Pennsylvania upon the Governor of Virginia, and both of them admitted the propriety of bringing the subject before the President, who immediately submitted the matter to the consideration of Congress. And this led to the act of 1793, of which we are now speaking. All difficulty as to the mode of authenticating the judicial proceeding was removed by the article in the Constitution, which declares, "that full faith and credit shall be given in each State to the public acts, records, and judicial proceedings, of every other State; and the Congress may by general laws prescribe the manner in which acts, records, and proceedings, shall be proved, and the effect thereof." And without doubt the provision of which we are now speaking—that is, for the delivery of a fugitive, which requires official communications between States, and the authentication of official documents—was in the minds of the framers of the Constitution, and had its influence in inducing them to give this power to Congress. And acting upon this authority, and the clause of the Constitution which is the subject of the present controversy, Congress passed the act of 1793, February 12th, which, as far as relates to this subject, is in the following words:

"Section 1. That whenever the Executive authority of any State in the Union, or of either of the Territories northwest or south of the river Ohio, shall demand any person as a fugitive from justice of the Executive authority of any such State or Territory to which such person shall have fled, and shall, moreover, produce the copy of an indictment found, or an affidavit made before a magistrate of any State or Territory as aforesaid, charging the person so demanded with having committed treason, felony, or other crime, certified as authentic by the Governor or chief Magistrate of the State or Territory from whence the person so charged fled, it shall be the duty of the Executive authority of the State or Territory to which such person shall have fled to cause him or her to be arrested and secured, and notice of the arrest to be given to the Executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear;

but if no such agent shall appear within six months from the time of the arrest, the prisoner may be discharged. And all cos:s or expenses incurred in the apprehending, securing, and transmitting such fugitive to the State or Territory making such demand shall be paid by such State or Territory.

"Section 2. And be it further enacted, That any agent, appointed as aforesaid, who shall receive the fugitive into his custody, shall be empowered to transport him or her to the State or Territory from which he or she shall have fled; and if any person or persons shall by force set at liberty or rescue the fugitive from such agent while transporting as aforesaid, the person or persons so offending shall, on conviction, be fined not exceeding five hundred dollars, and be imprisoned not exceeding one year."

It will be observed, that the judicial acts which are necessary to authorize the demand are plainly specified in the act of Congress; and the certificate of the Executive authority is made conclusive as to their verity when presented to the Executive of the State where the fugitive is found. He has no right to look behind them, or to question them, or to look into the character of the crime specified in this judicial proceeding. The duty which he is to perform is, as we have already said, merely ministerial—that is, to cause the party to be arrested, and delivered to the agent or authority of the State where the crime was committed. It is said in the argument, that the Executive officer upon whom this demand is made must have a discretionary executive power, because he must inquire and decide who is the person demanded. But this certainly is not a discretionary duty upon which he is to exercise any judgment; but is a mere ministerial duty—that is, to do the act required to be done by him, and such as every marshal and sheriff must perform when process, either criminal or civil, is placed in his hands to be served on the person named in it. And it never has been supposed that this duty involved any discretionary power, or made him anything more than a mere ministerial officer; and such is the position and character of the Executive of the State under this law, when the demand is made upon him and the requisite evidence produced. The

Governor has only to issue his warrant to an agent or officer to arrest the party named in the demand.

The question which remains to be examined is a grave and important one. When the demand was made, the proofs required by the act of 1793 to support it were exhibited to the Governor of Ohio, duly certified and authenticated; and the objection made to the validity of the indictment is altogether untenable. Kentucky has an undoubted right to regulate the forms of pleading and process in her own courts, in criminal as well as civil cases, and is not bound to conform to those of any other State. And whether the charge against Lago is legally and sufficiently laid in this indictment according to the laws of Kentucky, is a judicial question to be decided by the courts of the State, and not by the Executive authority of the State of Ohio.

The demand being thus made, the act of Congress declares, that "it shall be the duty of the Executive authority of the State" to cause the fugitive to be arrested and secured, and delivered to the agent of the demanding State. The words, "it shall be the duty," in ordinary legislation, imply the assertion of the power to command and to coerce obedience. But looking to the subject-matter of this law, and the relations which the United States and the several States bear to each other, the court is of opinion, the words "it shall be the duty" were not used as mandatory and compulsory, but as declaratory of the moral duty which this compact created, when Congress had provided the mode of carrying it into execution. The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the Executive of the State; nor is there any clause or provision in the Constitution which arms the Government of the United States with this power. Indeed, such a power would place every State under the control and dominion of the General Government, even in the administration of its internal concerns and reserved rights. And we think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it; for, if it

possessed this power, it might overload the officer with duties which would fill up all his time, and disable him from performing his obligations to the State, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State.

It is true that Congress may authorize a particular State officer to perform a particular duty; but if he declines to do so, it does not follow that he may be coerced, or punished for his refusal. And we are very far from supposing, that in using this word "duty," the statesmen who framed and passed the law, or the President who approved and signed it, intended to exercise a coercive power over State officers not warranted by the Constitution. But the General Government having in that law fulfilled the duty devolved upon it, by prescribing the proof and mode of authentication upon which the State authorities were bound to deliver the fugitive, the word "duty" in the law points to the obligation on the State to carry it into execution.

It is true that in the early days of the Government, Congress relied with confidence upon the co-operation and support of the States, when exercising the legitimate powers of the General Government, and were accustomed to receive it, upon principles of comity, and from a sense of mutual and common interest, where no such duty was imposed by the Constitution. And laws were passed authorizing State courts to entertain jurisdiction in proceedings by the United States to recover penalties and forfeitures incurred by breaches of their revenue laws, and giving to the State courts the same authority with the District Court of the United States to enforce such penalties and forfeitures, and also the power to hear the allegations of parties, and to take proofs, if an application for a remission of the penalty or forfeiture should be made, according to the provisions of the acts of Congress. And these powers were for some years exercised by State tribunals, readily, and without objection, until in some of the States it was declined because it interfered with and retarded the performance of duties which properly belonged to them, as State courts; and in other States, doubts appear to have arisen as

to the power of the courts, acting under the authority of the State, to inflict these penalties and forfeitures for offences against the General Government, unless especially authorized to do so by the State.

And in these cases the co-operation of the States was a matter of comity, which the several sovereignties extended to one another for their mutual benefit. It was not regarded by either party as an obligation imposed by the Constitution. And the acts of Congress conferring the jurisdiction merely give the power to the State tribunals, but do not purport to regard it as a duty, and they leave it to the States to exercise it or not, as might best comport with their own sense of justice, and their own interest and convenience.

But the language of the act of 1793 is very different. It does not purport to give authority to the State Executive to arrest and deliver the fugitive, but requires it to be done, and the language of the law implies an absolute obligation which the State authority is bound to perform. And when it speaks of the duty of the Governor, it evidently points to the duty imposed by the Constitution.in the clause we are now considering. The performance of this duty, however, is left to depend on the fidelity of the State Executive to the compact entered into with the other States when it adopted the Constitution of the United States, and became a member of the Union. It was so left by the Constitution, and necessarily so left by the act of 1793. .

/ And it would seem that when the Constitution was framed, and when this law was passed, it was confidently believed that a sense of justice and of mutual interest would insure a faithful execution of this constitutional provision by the Executive of every State, for every State had an equal interest in the execution of a compact absolutely essential to their peace and well being in their internal concerns, as well as members of the Union. Hence, the use of the words ordinarily employed when an undoubted obligation is required to be performed,. "it shall be his duty."

But if the Governor of Ohio refuses to discharge this duty, there is no power delegated to the General Government, either

through the Judicial Department or any other department, to use any coercive means to compel him.

And upon this ground the motion for the mandamus must be overruled.