IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY.

FEBRUARY TERM, 1867.

---

### IN THE MATTER OF PETER VOORHEES.

1. The terms "other crime," used in the clause of the constitution of the United States, relative to the surrender of fugitives from justice, mean any offence indictable by the laws of the state demanding the surrender.
2. If the demand be made in due form, and requisite documents exhibited, the duty to surrender is not discretionary, but is merely ministerial.
3. If the copy of the indictment, accompanying the requisition, contain a charge of the commission of a crime against the laws of the state making the demand, the tribunals of the state in which the criminal is found will not consider or pass upon the sufficiency of the indictment as a matter of technical pleading.
4. When a person infringes the criminal laws of a state, and departs therefrom, without waiting to abide the consequences of such act, he is a fugitive from justice within the meaning of the constitutional provision in question.

---

A *habeas corpus* was allowed at chambers, by Mr. Justice Bedle, directed to George Dean, commanding him to bring before the said justice the body of Peter Voorhees, with, &c.

VOL. III.                    I                    141

In obedience to this writ, Voorhees was brought before the justice, and the officer returned, as the justification of the imprisonment, the following facts, viz. : "That on the 17th of August, 1866, his excellency, Frederick Smyth, governor of the state of New Hampshire, issued, in writing, under his hand and great seal of said state of New Hampshire, his demand and requisition upon the executive authority of the state of New Jersey, a copy whereof is hereunto annexed, and caused the same to be delivered to his excellency, Marcus L. Ward, governor of the state of New Jersey, together with the copy of an indictment, returned by the grand jury of the county of Hillsborough, in the state of New Hampshire, certified by said Frederick Smyth, governor of New Hampshire, to be authentic; which copy of said indictment, and the certificates thereto, are hereto annexed; and on the twenty-eighth day of August, 1866, the said Marcus L. Ward, governor of the state of New Jersey, issued his warrant, under his hand and great seal of said state, a copy of which is hereto annexed, and on the 30th day of said August, by virtue of said warrant, and in obedience to the precept thereof, I arrested the body of the said Peter Voorhees, mentioned in said warrant, who is the same person named in said copy of indictment, and now hold him in custody, to be surrendered to the person who may be appointed by the executive authority of the state of New Hampshire, that the said Peter Voorhees may, by such person so appointed, be removed to the state of New Hampshire, there to be tried for the crime of which he is charged in and by said indictment; and I, therefore, return, as the cause of my detention of the said Peter Voorhees in my custody, that he, said Voorhees, is charged, as appears by said copy of indictment, certified by the governor of the state of New Hampshire to be authentic, with the crime of swindling and obtaining money by false pretences, committed in said state of New Hampshire; that he has fled from the justice of said state of New Hampshire, and that the executive authority of the state of New Hampshire has demanded

the said Peter Voorhees, as a fugitive from justice, of the executive authority of the state of New Jersey, to which state the said Peter Voorhees has fled from the justice of said state of New Hampshire."

Annexed to this return was a copy of the indictment referred to therein; also a copy of a warrant issued in the state of New Hampshire to apprehend said Peter Voorhees upon said indictment, and a copy of the officer's return, stating that after diligent search the defendant could not be found; also copies of the requisition of the governor of New Hampshire, and of the warrant of Governor Ward, founded thereon, for the apprehension of Voorhees. All these documents were certified in due form.

Mr. Justice Bedle directed the case to be argued at bar.

For the state of New Hampshire, *Edward W. Scudder*, with whom was *George Y. Sawyer*, of New Hampshire.

For the prisoner, *R. Gilchrist* and *J. P. Bradley*.

The opinion of the court was delivered by

BEASLEY, C. J. The prisoner in this case has been brought before the court upon a *habeas corpus*, the return to which shows that the officer who has him in custody justifies his detention by virtue of a warrant for his apprehension as a fugitive from justice, issued by the executive of this state, in compliance with a requisition from the governor of the state of New Hampshire. A motion is now made to discharge the prisoner on various grounds, which, each in its turn, will be briefly considered.

*First.* It is contended that the act which it is alleged the prisoner committed in the state of New Hampshire, is not a crime within the meaning of the constitutional provision upon which this requisition has been made.

The offence charged in the requisition, is the fact of obtaining money by false pretences.

The clause of the constitution of the United States, to

which this point relates, is as follows: "A person charged in any state with treason, felony, or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime." The inquiry, therefore, now arising is as to the exact meaning of the words " other crime," as here used. Counsel, on the part of the prisoner, insist that the expression " other crime," does not embrace any crimes which were not such at common law, at the time of the adoption of the constitution of the United States.

If this construction be correct, it is manifest that the important purpose of the provision will be but very imperfectly accomplished. The highly beneficial object in view was to provide a national assurance that offenders against the criminal laws of one state should not. find a sanctuary in the domain of another. The obligation to surrender such fugitives had, to a certain indefinite extent, often been acknowledged in the practice of civilized nations; and was, by some, admitted to be founded in the precepts of that code of universal morality which constitutes the *jus gentium*. Before the epoch of the constitution, many enlightened rulers had, on various occasions, refused to extend the protection of their sovereignty over criminals fleeing from justice; but still, in theory among writers upon public law, the obligation to make such surrender was, by many regarded as one of a questionable character. No one doubted that a nation had the right to deliver up the criminal to justice; but the positive duty to do so, as a doctrine of the law of nations, was, by no means, universally conceded. Besides this imperfection, the grade of the crime which created this imperfect obligation to give up the offender, could not, in the nature of things, but be a point of perplexing uncertainty; for while it was clear that the highest class of criminals, such as poisoners, assassins, and all who could be denominated *hostes humani generis,* should be yielded up for punishment, it was generally maintained that the same

course was not proper with respect to persons pursued for the lesser offences. It must be conceded, therefore, that the rule of international law upon this subject, would not have been adequate to the exigency arising from the consolidation of the several states of this republic into one nation; and, indeed, before that event, the evils resulting from the absence of a definite rule on the subject, had given rise to treaties between several of the colonies, and had occasioned the introduction of a clause, being similar to the one above quoted from the constitution, among the articles of confederation.

The purpose, then, of this provision of the constitution was, as I conceive, two-fold; first, to impose an absolute obligation on each state to surrender criminals fleeing from the justice of another state; and, second, to define clearly the class of criminals so to be surrendered. The rule of international comity was defective in both particulars, and the design, consequently, was to create a substitute which should be without either defect. I think this end has been attained. For, in the first place, the language of the clause is so plainly imperative in its character as to leave no room for contention that the obligation now imposed on the respective states to surrender criminals, is, in the least degree, a matter of discretion. In the place of spontaneous submission to the law of comity, there is now substituted that implicit obedience which is due to a rule of law. No state can refuse to surrender this class of criminals, because the right to require such surrender is a part of the sovereignty of the nation. It is true, that under present legal conditions, the general government, as was decided in the case of the *Commonwealth of Kentucky* v. *Dennison*, 24 *How.* 66, cannot enforce the performance of this constitutional obligation. But this results entirely from the fact that the act of congress which regulates these proceedings, directs the constitutional demand to be made upon the governor of the state to which the fugitive has fled; but as the executive of a state is not a federal officer, the general government cannot compel the performance of a function which it has no right

to annex to the office. This was the extent of the decision just referred to; but I can entertain no doubt of the power of congress to vest in any national officer the authority to cause the arrest in any state of a fugitive from the justice of another state, and to surrender such fugitive on the requisition of the executive of the latter state. The national right to require the surrender, under the terms of the constitution, seems to me to be clear, and all that is necessary to render such right enforceable, in every case, is the necessary organ of the federal government. Hitherto the nation has trusted this important office, so essential to the harmony of the states, and the complete administration of the laws, in the hands of the several local executives; and although these officers, as has just been observed, cannot be coerced to take upon themselves the burthen of such duty, yet, nevertheless, it is with satisfaction that I remark that it has been, for the most part, discharged by them, in entire good faith, and with perfect loyalty to the constitutional requisition. The few exceptions which are recollected have, in general, arisen from a mistaken sense as to the true nature of the duty itself; for an idea has undoubtedly prevailed, to a considerable extent, that such duty, in some respects, was one resting in discretion. But this is altogether an error. If the demand be made in due form, and the requisite documents exhibited, showing that the fugitive is charged with crime, the duty to surrender becomes merely a ministerial one. Under such circumstances, to refuse to authorize the extradition is a clear infraction of the rule prescribed in the constitutional clause above quoted. I think it, therefore, indisputable, that the constitution has made the surrender of a fugitive from justice, which by the law of nations depended on the concessions of comity, a rule of law of perfect obligation and entirely imperative in its character.

Has it removed also the second defect, above enumerated, existing in the international practice? In other words, has this clause of the constitution defined the class of cases, to which is attached the constitutional duty of the extradition

of the offender. If the usual rules of construction are applicable, I am entirely at a loss to understand how any uncertainty has ever been supposed to exist on this subject. The category of offences is, "treason, felony, or other crime." This clause, in the articles of confederation, instead of the term "crime," contained the expression "high misdemeanor." It is obvious this latter description was indefinite to the last degree, for what was a high misdemeanor? The retention of words whose sense was so undefined would have left the subject open to endless dissension, and there is every reason to believe that the word "crime" was substituted with a view to avoid a result so disastrous. But I am not aware that any jurist, in any age of the common law, has ever doubted as to the meaning of the word "crime." It is *nomen generalissamum,* and has always been considered as embracing every species of indictable offence. How, then, in the use in question, is a different meaning to be ascribed to it? It is said that the word must retain the signification it possessed at the time it was used by the framers of the constitution. But it cannot escape remark, that at that time it was well understood that the term thus used was generic, and had been from the beginning, and would be in the future, constantly embracing new species of offences. A word with this quality was indispensable, unless it is to be supposed that it was intended to provide for every offence of that day, no matter how trivial, there should be a surrender of the criminal, but that for offences created by future legislation, no matter how heinous, there should be no surrender. The constitution was not a mere temporary contrivance; it was intended for posterity as well as for the then passing generation. In all its various parts it exhibits the clearest manifestations, that it was designed to adjust itself to the exigencies incident to the growth of a great people; and it does not, therefore, appear to me to be a reasonable interpretation to say that in the section under consideration no provision was made for the future. On the contrary, in my opinion, the word "crime,"

with characteristic forethought, was selected in lieu of the phrase "high misdemeanor," in order to extend the regulation to all classes of offenders, which alone would effect one of the principal objects in view—that of rendering the classification perfectly definite. Nor do I perceive much force in the objection, that we cannot suppose it was intended to place within the operation of this provision all persons who might be guilty of the minor offences, such as assaults, libels, and the entire train of similar misdemeanors. It is not probable that a state will ever require the surrender of offenders of this grade, but if the demand should be made, and the offence charged be indictable, it is not understood how such demand can be refused. The offence in such case would be a public one; as much so as the commission of the highest crime, and it is embraced in the words of the constitution. It is the right of the sovereignty whose laws have been violated, to decide what offenders it will pursue, and the state upon which the demand is made, cannot rightfully call in question that decision. In practice, there will be little danger of an abuse of this constitutional prerogative, and the possibility of such abuse is of but slight consideration, in comparison with the pre-eminently great advantage which will result from the limits of such prerogative being so clearly defined as to be in every respect unquestionable. Nor should it pass without remark, that if the definition of offences given in this clause should be restricted to such as existed by law, at the date of the adoption of the constitution, very many crimes of great atrocity would become dispunishable by the flight of the perpetrators of them. Public policy, the security of society, and the regular and perfect dispensation of justice, as well as the established maxims of statutory construction, alike require that the term " crime," as thus used, should be held to comprehend every violation of law which is of an indictable nature.

Nor is the view of this topic, above taken, a novel one. It is sustained, as it is believed, with complete unanimity, by the authorities. "I am not aware," says Chancellor Kent,

In the matter of Peter Voorhees.

"that there has been any judicial opinion on this provision, and as it stands, I should apprehend, that on the demand being made, and the documents exhibited, no discretion remained with the executive of the state to which the fugitive had fled, and that it was his duty to cause the fugitive to be arrested and surrendered." 2 *Kent's Com.* 32, *note c.*

In the case of *Fetter,* 3 *Zab.* 311, the point was distinctly made, that the offence charged was not indictable at common law, and could only be so by force of a statute of California, but Chief Justice Green overruled the objection. To the same effect is the case of *Clark,* 9 *Wend.* 212. In addition to these adjudications of so much weight, we have the important case, already referred to, of the *Commonwealth of Kentucky* v. *Dennison,* 24 *How.* 66, and although this is subject to the criticism of counsel, that the court finally determined that it had not jurisdiction, still as the case was fully argued, and evidently considered with much care, I cannot but regard the views expressed on this subject of constitutional exposition, as possessed of little less than the force of absolute authority. A reference to the case will show that this point, as to the import of the word "crime" in this clause, was directly presented for consideration; after a careful discussion, the opinion, delivered by the Chief Justice, says: "The conclusion is irresistible, that this compact engrafted on the constitution, included, and was intended to include, every offence made punishable by the law of the state in which it was committed, and it gives the right to the executive authority of the state to demand the fugitive from the executive authority of the state in which he is found; that the right given to 'demand' implies that it is an absolute right; and it follows, that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or the laws of the state to which the fugitive has fled."

The motion to discharge the prisoner, therefore, so far as it rests on the first point, cannot prevail.

The second objection taken against the proceedings, was,

that from the copy of the indictment annexed to the return, it does not appear that the defendant has committed any crime against the laws of New Hampshire.

The ground of this contention was, that although the false pretences are set forth in this pleading, there are no statements contained in it to show how such pretences were made operative in the production of the fraud which is alleged.

It would be a complete answer to this position to remark, that there is no rule of criminal pleading which requires such manifestation, and that many of the approved precedents, in this respect, accord with the form thus criticised. But, to avoid misconception, it is deemed best to resolve the question on the more general ground, that this is a matter of pleading with which the authorities of this state have no concern. It is clear, that this indictment does contain a charge of the commission of a crime against the laws of New Hampshire, and that is all that is necessary. It is for the judicial tribunals of the latter state to decide upon the sufficiency of such charge as a matter of technical pleading.

A third and last exception to the arrest, in this case, was that it does not appear that the prisoner is a fugitive from the justice of New Hampshire.

But this objection is not well founded. A person who commits a crime within a state, and withdraws himself from such jurisdiction without waiting to abide the consequences of such act, must be regarded as a fugitive from the justice of the state whose laws he has infringed. Any other construction would not only be inconsistent with good sense, and with the obvious import of the word to be interpreted in the context in which it stands, but would likewise destroy, for most practical purposes, the efficacy of the entire constitutional provision.

The prisoner is not entitled to be discharged, but must be remanded into custody.