## NEW YORK *v.* O'NEILL.

No. 53. Argued November 20, 1958.—Decided March 2, 1959.

*Reeves Bowen,* Assistant Attorney General of Florida, argued the cause for petitioner. With him on the brief were *Richard W. Ervin,* Attorney General of Florida, and *Frank S. Hogan.*

*L. J. Cushman* argued the cause and filed a brief for respondent.

*James C. Dezendorf* and *Louis A. Kohn* filed a brief for the National Conference of Commissioners on Uniform State Laws, as *amicus curiae,* in support of petitioner.

2

*John Anderson, Jr.,* Attorney General of Kansas, filed a brief, as *amicus curiae,* in support of petitioner. The following States and the Commonwealth of Puerto Rico joined in this brief: Alabama, by *John Patterson,* Attorney General; Arkansas, by *Bruce Bennett,* Attorney General; California, by *Edmund G. Brown,* Attorney General; Colorado, by *Duke W. Dunbar,* Attorney General; Connecticut, by *John J. Bracken,* Attorney General; Georgia, by *Eugene Cook,* Attorney General; Idaho, by *Graydon W. Smith,* Attorney General; Indiana, by *Edwin K. Steers,* Attorney General; Iowa, by *Norman A. Erbe,* Attorney General; Kentucky, by *Jo M. Ferguson,* Attorney General; Louisiana, by *Jack P. F. Gremillion,* Attorney General; Maine, by *Frank F. Harding,* Attorney General; Maryland, by *C. Ferdinand Sybert,* Attorney General; Minnesota, by *Miles Lord,* Attorney General; Mississippi, by *Joe T. Patterson,* Attorney General; Missouri, by *John M. Dalton,* Attorney General; Montana, by *Forrest H. Anderson,* Attorney General; Nebraska, by *Clarence S. Beck,* Attorney General; Nevada, by *Harvey Dickerson,* Attorney General; New Hampshire, by *Louis C. Wyman,* Attorney General; New Jersey, by *David D. Furman,* Attorney General; New Mexico, by *Fred M. Standley,* Attorney General; New York, by *Louis J. Lefkowitz,* Attorney General; North Carolina, by *Malcolm B. Seawell,* Attorney General; North Dakota, by *Leslie R. Burgum,* Attorney General; Ohio, by *William Saxbe,* Attorney General; Oklahoma, by *Mac Q. Williamson,* Attorney General; Oregon, by *Robert Y. Thornton,* Attorney General; Commonwealth of Puerto Rico, by *Francisco Espinosa, Jr.,* Acting Attorney General; Rhode Island, by *J. Joseph Nugent,* Attorney General; South Carolina, by *T. C. Callison,* Attorney General; Tennessee, by *George F. McCanless,* Attorney General; Texas, by *Will Wilson,* Attorney General; Utah, by *E. Richard Callister,* Attorney General; Vermont, by *Frederick M.*

*Reed,* Attorney General; Virginia, by *Albertis S. Harrison, Jr.,* Attorney General; Washington, by *John J. O'Connell,* Attorney General; West Virginia, by *W. W. Barron,* Attorney General; and Wyoming, by *Thomas O. Miller,* Attorney General.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case is before us to determine the constitutionality of a Florida statute entitled "Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings." Fla. Stat., 1957, §§ 942.01–942.06. Respondent, a citizen of Illinois, had traveled to Florida to attend a convention. In accordance with the Florida statute, the Circuit Court of Dade County, Florida, responded to a certificate executed by a judge of the Court of General Sessions, New York County (under N. Y. Code Crim. Proc. § 618–a), by summoning respondent before it to determine whether he was to be given into the custody of New York authorities to be transported to New York to testify in a grand jury proceeding in that State. The Circuit Court, ruling that the Florida statute violated the Florida and the United States Constitutions, refused to grant New York's request. 9 Fla. Supp. 153. The Supreme Court of Florida affirmed this decision on the ground that the statute violated the United States Constitution. 100 So. 2d 149. We granted certiorari, 356 U. S. 972, inasmuch as this holding brings into question the constitutionality of a statute now in force in forty-two States and the Commonwealth of Puerto Rico. (Thirty-nine States and Puerto Rico joined in an *amici* brief in support of the Uniform Act.) The certificate filed with the Circuit Court of Dade County recites that respondent's testimony is desired by a New York County grand jury. That certificate is, under the terms of the statute, "prima facie

evidence of all the facts stated therein." Fla. Stat., 1957, § 942.02 (2). Therefore, on the face of the record, respondent's attendance at a grand jury investigation in New York is required by the certificate filed with the Florida court and not withdrawn from it. Neither party has suggested that this is not a live litigation nor do we find any ground for deeming the case to be moot.

The Uniform Act as enacted by the Florida Legislature in 1941 was formulated by the National Conference of Commissioners on Uniform State Laws in its present form in 1936. See Handbook of the National Conference of Commissioners on Uniform State Laws 333 (1936); 9 U. L. A. 91 (1957). The Uniform Act is reciprocal. It is operative only between States which have enacted it or similar legislation for compelling of witnesses to travel to, and testify in, sister States.

The terms of the statute make quite clear the procedures to be followed. The judge of the court of the requesting State files in any court of record in the State in which the witness may be found a certificate stating the necessity of the appearance of such witness in a criminal prosecution or grand jury investigation in the requesting State. The certificate must also state the number of days the witness would be required to attend. Upon receipt of such a certificate a hearing is held by the court in which it is filed. In the hearing, at which under the Florida Act the witness is entitled to counsel, the court which received this certificate is obliged to determine whether an order to attend the prosecution or grand jury investigation in the requesting State would comply with conditions set forth in the statute: that the witness is material and necessary; that the trip to the requesting State would not involve undue hardship to the witness; that the laws of the requesting State and States through which the witness must travel grant him immunity from arrest and the service of civil and criminal process. Fur-

thermore, the statute provides that the witness must be tendered ten cents a mile for each mile to and from the requesting State and five dollars for each day that he is required to travel and attend as a witness. Under the statute the order of the forwarding State to the witness may take two forms: first, the court may issue a summons directing the witness to attend and testify in the requesting State; second, if the certificate of the requesting State so recommends, and if the recommendation is found to be desirable by the court of the forwarding State, the court may immediately deliver the witness to an officer of the requesting State. Furthermore, if such a recommendation is made by the requesting State, instead of the initial notification of hearing the court of the forwarding State may take the witness into immediate custody. Whether the procedure be by notification and then summons or by apprehension and then delivery, the hearing and the issues to be determined therein are the same.

In *Commonwealth of Kentucky* v. *Dennison,* 24 How. 66, Mr. Chief Justice Taney, speaking of the obligation imposed by the Constitution upon the Governor of Ohio to deliver to Kentucky one accused of violation of the criminal laws of Kentucky, called attention "to the obvious policy and necessity of this provision to preserve harmony between States, and order and law within their respective borders . . . ." 24 How., at 103. The same "policy and necessity" underlie the measure adopted by Florida and forty-two other jurisdictions. Unless there is some provision in the United States Constitution which clearly prevents States from accomplishing this end by the means chosen, this Court must sustain the Uniform Act. The absence of a provision in the United States Constitution specifically granting power to the States to legislate respecting interstate rendition of witnesses presents no bar. To argue from the declaratory incor-

6

poration in the Constitution, Art. IV, § 2, of the ancient political policy among the Colonies of delivering up fugitives from justice an implied denial of the right to fashion other cooperative arrangements for the effective administration of justice, is to reduce the Constitution to a rigid, detailed and niggardly code. In adjudging the validity of a statute effecting a new form of relationship between States, the search is not for a specific constitutional authorization for it. Rather, according the statute the full benefit of the presumption of constitutionality which is the postulate of constitutional adjudication, we must find clear incompatibility with the United States Constitution. The range of state power is not defined and delimited by an enumeration of legislative subject-matter. The Constitution did not purport to exhaust imagination and resourcefulness in devising fruitful interstate relationships. It is not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution. Far from being divisive, this legislation is a catalyst of cohesion. It is within the unrestricted area of action left to the States by the Constitution.

The Supreme Court of Florida found that the statute violated the Privileges and Immunities Clauses found in Art. IV, § 2, and in the Fourteenth Amendment. The Privileges and Immunities Clause of Art. IV, § 2, proscribes discrimination by a State against a citizen of another State. *Slaughter-House Cases*, 16 Wall. 36, 77. There is no such discrimination here. The Florida statute applies to all persons within the boundaries, and therefore subject to the jurisdiction, of Florida. The finding of the Florida Supreme Court that the right to ingress and egress is a privilege of national citizenship protected by the Fourteenth Amendment raises an issue that has more than once been stirred in opinions of this Court.

See concurring opinions in *Edwards* v. *California,* 314 U. S. 160, 178 and 184, in connection with *Crandall* v. *Nevada,* 6 Wall. 35. However, even if broad scope be given to such a privilege, there is no violation of that privilege by the Florida statute. Florida undoubtedly could have held respondent within Florida if he had been a material witness in a criminal proceeding within that State. And yet this would not have been less of a limitation on his claim of the right of ingress and egress than is an order to attend and testify in New York. There are restrictions on the exercise of the claimed constitutional right. One such restriction derives from the obligation to give testimony. This obligation has been sustained where it necessitated travel across the Atlantic Ocean: *Blackmer* v. *United States,* 284 U. S. 421.*

More fundamentally, this case does not involve freedom of travel in its essential sense. At most it represents a temporary interference with voluntary travel. Particularly is this so in an era of jet transportation when vast distances can be traversed in a matter of hours. Respondent was perfectly free to return to Florida after testifying in New York. Indeed, New York was obligated to pay his way back to Florida. Or, after testifying, he could return to Illinois or remain in New York. The

---

*Compulsion to travel across State boundaries to testify in sister States antedates the United States Constitution. See Laws of Maryland, November 1785, Chapter I, An ACT to approve, confirm and ratify, the compact made by the commissioners appointed by the general assembly of the Commonwealth of Virginia, and the commissioners appointed by this state, to regulate and settle the jurisdiction and navigation of Patowmack and Pocomoke rivers, and that part of Chesapeake bay which lieth within the territory of Virginia: "And in all cases of trial in pursuance of the jurisdiction settled by this compact, citizens of either state shall attend as witnesses in the other, upon a summons from any court or magistrate having jurisdiction, being served by a proper officer of the county where such citizen shall reside."

8

privilege of ingress and egress among the States which has been urged in opinions is of hardier stuff. The privilege was to prevent the walling off of States, what has been called the Balkanization of the Nation. The requirement which respondent resists conduces, it merits repetition, toward a free-willed collaboration of independent States.

The more relevant challenge to the statute invalidated by the Supreme Court of Florida is that it denies due process of law in violation of the Fourteenth Amendment. Because of the generous protections to be accorded a person brought or summoned before the court of the forwarding State, procedural due process in the hearing itself must be accorded and this is firmly established. The Circuit Court of Dade County ruled that the absence of any provision for bail in the procedure of apprehension and delivery violated due process of law. Since the Supreme Court of Florida expressly refrained from ruling whether the failure of the statute to provide for bail for persons attached and delivered violated either the Florida Constitution or the Fourteenth Amendment, and since silence on bail is not tantamount to proscription of bail, the claim that this silence of the statute is a violation of the Fourteenth Amendment is a hypothetical question which need not now be considered. We may add that the sole claim before us, as it was the sole claim dealt with by the Supreme Court of Florida, is that the statute is unconstitutional on its face. No claim is before us that the administration of the statute in the particular circumstances of this case violates due process.

The Supreme Court of Florida held that inasmuch as what was ordered was to be carried on in a foreign jurisdiction, the Florida courts could not constitutionally be given jurisdiction to order it (citing *Pennoyer* v. *Neff*, 95 U. S. 714). However, the Florida courts had immediate personal jurisdiction over respondent by virtue of his

presence within that State. Insofar as the Fourteenth Amendment is concerned, this gave the Florida courts constitutional jurisdiction to order an act even though that act is to be performed outside of the State. See *Steele* v. *Bulova Watch Co.*, 344 U. S. 280; Restatement, Conflict of Laws, § 94.

The primary purpose of this Act is not eleemosynary. It serves a self-protective function for each of the enacting States. By enacting this law the Florida Legislature authorized and enabled Florida courts to employ the procedures of other jurisdictions for the obtaining of witnesses needed in criminal proceedings in Florida. Today forty-two States and Puerto Rico may facilitate criminal proceedings, otherwise impeded by the unavailability of material witnesses, by utilizing the machinery of this reciprocal legislation to obtain such witnesses from without their boundaries. This is not a merely altruistic, disinterested enactment.

In any event, to yield to an argument that benefiting other States is beyond the power of a State would completely disregard the inherent implications of our federalism within whose framework our organic society lives and moves and has its being—the abundant and complicated interrelationship between national authority and the States, see *Hopkins Federal Savings & Loan Assn.* v. *Cleary,* 296 U. S. 315, and between the States *inter sese.* To yield to this argument would foreclose to the States virtually all arrangements which increase comity among the States. These extra-constitutional arrangements are designed to solve "problems created by a constitutional division of powers without disturbance of the federal nature of our government." Clark, Joint Activity Between Federal and State Officials, 51 Pol. Sci. Q. 230, 269. Reciprocal legislation, such as the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings and the

Acts providing reciprocal periods of grace in the registration of out-of-state automobiles, see *Kane* v. *New Jersey,* 242 U. S. 160, is one such arrangement. The uniform laws proposed by the National Conference of Commissioners on Uniform State Laws and adopted by individual States have (among other benefits) increased ease of interstate commercial relationships by providing uniformity in commercial laws through uniform Acts governing sales and negotiable instruments. Uniform laws have frequently been concerned with enforcement of criminal laws. Thus, the Uniform Criminal Extradition Act, 9 U. L. A. 263 (1957), provides for rendition of alleged criminals whose conduct does not bring them within the constitutional extradition provision. U. S. Const., Art. IV, § 2; *Hyatt* v. *People ex rel. Corkran,* 188 U. S. 691. There are numerous cooperative undertakings among States by the formation of agencies which study joint problems and make suggestions for internal management within individual States calculated to increase comity among the several States. Interstate preserves are regulated through the device of fusion of distinct state administrative agencies by means of joint sessions and joint action. The Federal Government has also acted in aid of States in matters of local concern through auxiliary legislation (in game statutes, for example), through grants-in-aid, and through legislation calling for cooperation be ween particular state administrative agencies and federal agencies operating within the same general area of regulation. See Frankfurter and Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L. J. 685, 688–691. About such instances it has been said that they "illustrate extra-constitutional forms of legal invention for the solution of problems touching more than one state. They were neither contemplated nor specifically provided for by the Constitution." Frankfurter and Landis, *supra,* at 691.

The manifold arrangements by which the Federal and State Governments collaborate constitute an extensive network of cooperative governmental activities not formulated in the Constitution but not offensive to any of its provisions or prohibitions. See Clark, *supra*. Among the examples of such devices discussed by Dr. Clark are the Selective Service System, Civilian Conservation Corps, deportation law enforcement, administration of the Pure Food and Drugs Act and the federal game statutes, and federal-state contracts for the boarding of federal prisoners in state facilities.

To hold that these and other arrangements are beyond the power of the States and Federal Government because there is no specific empowering provision in the United States Constitution would be to take an unwarrantedly constricted view of state and national powers and would hobble the effective functioning of our federalism. Diffusion of power has its corollary of diffusion of responsibilities, with its stimulus to cooperative effort in devising ways and means for making the federal system work. That is not a mechanical structure. It is an interplay of living forces of government to meet the evolving needs of a complex society.

The Constitution of the United States does not preclude resourcefulness of relationships between States on matters as to which there is no grant of power to Congress and as to which the range of authority restricted within an individual State is inadequate. By reciprocal, voluntary legislation the States have invented methods to accomplish fruitful and unprohibited ends. A citizen cannot shirk his duty, no matter how inconvenienced thereby, to testify in criminal proceedings and grand jury investigations in a State where he is found. There is no constitutional provision granting him relief from this obligation to testify even though he must travel to another State to do so. Comity among States, an end particularly to be

cherished when the object is enforcement of internal criminal laws, is not to be defeated by an *a priori* restrictive view of state power.

The judgment of the Supreme Court of Florida is reversed, and the cause is remanded to that court for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

The right to free ingress and egress within the country and even beyond the borders is a basic constitutional right, though it is not contained *in haec verba* in the Constitution. It had been included in the Articles of Confederation, Article IV of which provided in part:

> "The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all the privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and regress to and from any other state . . . ."

As Chafee, Three Human Rights in the Constitution (1956), p. 185, states, the failure to make specific provision for this right in the Constitution must have been on the assumption that it was already included. For it is impossible to think that a right so deeply cherished in the Colonies was rejected outright. "The Convention carefully prevented states from passing tariff laws; surely it did not want state immigration laws." Chafee, *op. cit., supra,* at 185. The Constitution was designed "to secure the freest intercourse between the citizens of the different

States," said Chief Justice Taney in *The Passenger Cases,* 7 How. 283, 492. And he added: "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Id.,* 492. This right of free ingress and egress is one "arising out of the nature and essential character of the Federal government." *Duncan v. Missouri,* 152 U. S. 377, 382; *Twining v. New Jersey,* 211 U. S. 78, 97. As stated by the Court in *Williams v. Fears,* 179 U. S. 270, 274:

> "Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution."

It has often been called a right or privilege of national citizenship; *Crandall v. Nevada,* 6 Wall. 35, 44, 49; *Ward v. Maryland,* 12 Wall. 418, 430; *Slaughter House Cases,* 16 Wall. 36, 79; *Twining v. New Jersey, supra,* 97; *Edwards v. California,* 314 U. S. 160, 178–181, 183 (concurring opinions). As such, it is protected against state action by the Privileges and Immunities Clause of the Fourteenth Amendment. *Slaughter House Cases, supra,* at 74–79; *In re Kemmler,* 136 U. S. 436, 448.

It has at times been considered under the protective care of the Commerce Clause subject to control by Congress but free from stoppage or impairment by the States. *Edwards v. California, supra.*

In *Kent v. Dulles,* 357 U. S. 116, we held that this right to travel was a part of the citizen's "liberty" within

14

the meaning of the Due Process Clause of the Fifth
Amendment.

> "Freedom of movement across frontiers in either
> direction, and inside frontiers as well, was a part of
> our heritage. Travel abroad, like travel within the
> country, may be necessary for a livelihood. It may
> be as close to the heart of the individual as the choice
> of what he eats, or wears, or reads. Freedom of
> movement is basic in our scheme of values." *Id.,*
> at 126.

Whatever may be the sources of this right of free move-
ment—the right to go to any State or stay home as one
chooses—it is an incident of national citizenship and
occupies a high place in our constitutional values.

This right of national citizenship has been qualified.
One qualification was made by the Extradition Clause of
Art. IV, § 2, of the Constitution: [1]

> "A Person charged in any State with Treason,
> Felony, or other Crime, who shall flee from Justice,
> and be found in another State, shall on Demand of
> the executive Authority of the State from which he
> fled, be delivered up, to be removed to the State
> having Jurisdiction of the Crime."

But that limitation on the right of free movement applies
only when the citizen is a fugitive from the law.

Yet O'Neill is not a fugitive from justice. He carries
no criminal taint. He is wanted as a witness in New
York. But there is no provision of the Constitution
which provides for the extradition of witnesses by the
States. That power is today judicially created. But I
find no authority on the part of the States to enlarge and
expand the power of extradition specifically restricted by

---

[1] This provision is implemented by an Act of Congress. 18 U. S. C.
c. 209.

the Constitution to criminals. As stated in *People ex rel. Corkran* v. *Hyatt,* 172 N. Y. 176, 182, 64 N. E. 825, 826, aff'd 188 U. S. 691, ". . . no person can or should be extradited from one state to another unless the order falls within the constitutional provision, . . . power which independent nations have to surrender criminals to other nations as a matter of favor or comity is not possessed by the states." We allow today only what a constitutional amendment could achieve. We in effect amend Art. IV, § 2, by construction to add "witnesses" to the group now embraced in Art. IV, § 2.

This right of freedom of movement even of the innocent may not be absolute. Perhaps a State could stop a migrant at its borders for health inspection. There may be other narrow and limited qualifications to this right of free ingress and egress which a State may impose. But I know of no power on the part of a State to pick a citizen up and forcibly remove him from its boundaries where there is no basis of extradition. *Blackmer* v. *United States,* 284 U. S. 421, is of no help here. There the United States was requiring a citizen, resident abroad, to return to this country to testify and penalizing him for his refusal. This was his home, to which he was rooted and where his loyalties lay. The obligation was exacted by the Federal Government as a requirement of national citizenship. Congress has stated this responsibility in an Act, 62 Stat. 755, 18 U. S. C. § 1073, which, *inter alia,* makes it a federal crime for a person to move in interstate commerce "to avoid giving testimony" in certain criminal proceedings. And Congress has made explicit provision concerning the State to which the witness may be removed.[2] I can understand how this regulation of national citizenship can

---

[2] Section 1073 provides: "Violations of this section may be prosecuted only in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement."

be made by Congress which speaks with authority in the federal field of interstate commerce.[3] I fail to see how a State can regulate any of the incidents of national citizenship. I see no greater power on the part of a State to snatch a law-abiding citizen from his abode and send him to another State than to stop him at the border, as was done in *Edwards* v. *California, supra,* because it does not like the cut of his jib. State action was precluded in *Edwards* v. *California, supra,* even though Congress had not acted. It is even more obviously precluded where Congress has acted.[4]

Reciprocal and uniform laws, like interstate compacts, doubtless serve many useful purposes. But a State does not increase its sovereign powers by making an agreement with another State. Whether the right of ingress and egress be bottomed on the Privileges and Immunities Clause of the Fourteenth Amendment, the Commerce Clause, or a basic "liberty" inherent in national citizenship, I know of no way in which a State may take it from a citizen. To say that there is no interference here because O'Neill will be free to return to Florida later is to trifle with a basic human right. The Court's argument enables the States through reciprocal laws to generate power that they lack acting separately. It speaks of the importance

---

[3] See H. R. Rep. No. 1458, 73d Cong., 2d Sess., p. 2; H. R. Rep. No. 1596, 73d Cong., 2d Sess., p. 2; *Hemans* v. *United States,* 163 F. 2d 228, 238-239.

[4] In situations no less impressive than the present we have barred state action where, as here, Congress has acted in the same field. *Charleston & Car. R. Co.* v. *Varnville Co.,* 237 U. S. 597; *Hines* v. *Davidowitz,* 312 U. S. 52; *Pennsylvania* v. *Nelson,* 350 U. S. 497. In *Charleston & Car. R. Co.* v. *Varnville Co., supra,* at 604, Mr. Justice Holmes speaking for the Court said:

. "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."

of encouraging "resourcefulness of relationships between States on matters as to which there is no grant of power to Congress and as to which the range of authority restricted within an individual State is inadequate." Yet if the power is inadequate for either Florida or New York acting separately (as I am sure it is), I fail to see how it can be made adequate by the pooling of their inadequacies. To make it such is indeed a saltatorial achievement. The fact that a resident of a State can be compelled to testify in that State is no ground for compelling him "to leave his State and go to some other State to testify viva voce." *In re Allen,* 49 D. & C. Rep. 631, 640. His right to go or stay is an incident of national citizenship, qualified only by an appropriate exercise of federal power.[5]

The power of extradition was an expression of a "policy of mutual support, in bringing offenders to justice," *Kentucky* v. *Dennison,* 24 How. 66, 100; and to substitute a system of law, superior to state authority, for the system of comity prevailing among sovereign nations. *Innes* v. *Tobin,* 240 U. S. 127, 130–131. The Federal Act governing witnesses who are fugitives is an assertion by Congress of control over our nationals. Any policy of providing compulsory delivery of witnesses from one State to another is in other words a federal policy. If we allow the States to exercise that power as they like, we might as well permit them to sanction compulsory delivery of

---

[5] The Report of Committee on Securing Compulsory Attendance of Non-Resident Witnesses of the National Conference of Commissioners on Uniform State Laws, as reported in 8 Wigmore on Evidence, § 2195 (*e*), states: "This character of legislation is not free from constitutional difficulties, and the only case which we have found in which the constitutionality thereof has been directly upheld is the case of Commonwealth of Massachusetts v. Klaus, 130 N. Y. Supp. 713. In the case cited the constitutionality of the New York statutes was upheld in an opinion by Judge Scott, but there is a strong dissenting opinion by Judge Laughlin."

citizens from one State into another for purposes of being sued. See *Massachusetts* v. *Klaus,* 130 N. Y. Supp. 713, 722 (dissenting opinion). If it took Art. IV, § 2, of the Constitution to provide for the compulsory delivery of a person charged with a crime from one State to another, and a Federal Act to require the delivery of witnesses over state lines, it would seem to follow *a fortiori* that further constitutional provisions would be required to authorize one State to provide for the compulsory delivery of an innocent person to another State. See *In re Allen, supra.*

This is not giving the Constitution a niggardly construction. I urge a liberal construction which will respect the civil rights of the citizens. This right of people to choose such State as they like for their abode, to remain unmolested in their dwellings, and to be protected against being whisked away to another State [6] has been, until today, zealously guarded. Until now, it has been part and parcel of the cherished freedom of movement protected by the Constitution.

I would affirm the judgment entered by a unanimous vote of the Florida Supreme Court.

---

[6] The harshness of this procedure is emphasized by a feature of this extradition law on which the Florida Supreme Court has not yet passed. The New York statute (N. Y. Code Crim. Proc. § 618–a; and see Fla. Stat., 1957, § 942.02) gives the witness who is extradited only $5 a day for his maintenance in New York, a sum plainly inadequate in light of today's cost of living.