PUERTO RICO TELEPHONE COMPANY, Petitioner, *v.* PUERTO RICO LABOR RELATIONS BOARD ET AL., Respondents.

No. JRT-64-5.    Decided April 13, 1965.

*Sifre & Ruiz Suria* for petitioner. *J. B. Fernández Badillo, Solicitor General, Luis M. Rivera Pérez,* and *Celia Canales* for the respondent Board.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On October 7, 1963, the Union of Employees of the Telephone Industry filed a charge before the Puerto Rico Labor Relations Board against Puerto Rico Telephone Co. It alleged that it violated and continued to violate art. XV (4) of the collective agreement existing between them, in refusing to resort to the Conciliation and Arbitration Service of the Department of Labor for the purpose of reaching a final agreement or solution on the mass layoffs of members of complainant Union made by the Company.

As a result of such charge, on November 20, 1963, the Board issued a complaint, case CA-2915, charging the Telephone Co. with engaging in an unfair labor practice consisting in the violation of the collective agreement. The charge

was based on the following facts alleged in the complaint: That on November 8, 1962, the Company and the Union signed a collective agreement, to be effective until October 27, 1964; that the agreement provided in art. XV a complaint and grievance procedure for conflicts arising in connection with the contractual provisions; that late on September 1963, 43 Company employees claimed that they had been suspended from employment and salary in violation of the collective agreement, and the matter had been submitted to the Grievance Committee created by the agreement; that the Union delegates in the Grievance Committee requested the Company to furnish certain information for the purpose of considering whether the layoffs of the permanent employees was justified; that the Grievance Committee was unable to reach an agreement because the Company refused to furnish the requested information; that the Union therefore invoked art. XV (4) (c) of the collective agreement whereby resort may be had to the Conciliation Service, and that the Company refused and continues to refuse to permit the intervention of the Conciliation Service, and had also refused to designate a fifth member to discuss the intervention of the Conciliation Service as well as the propriety of the information requested.

The Telephone Company answered the complaint and stated its position. It alleged as an affirmative defense, among others: that the Board lacked jurisdiction of the matter because the National Labor Relations Board had basically assumed jurisdiction over the same facts by means of a complaint already issued and heard before a Trial Examiner, case No. 24-CA-1739, which was pending decision by the National Board on that date.

### THE AGREEMENT

Article XV of the applicable collective agreement provides in its first section: "For the purposes of this Agreement, a complaint is defined as the allegation made by one or more

employees of the violation or violations of the contractual provisions herein established." Section 4 of art. XV creates a Grievance Committee composed of two Company representatives and two Union representatives who shall meet in private, with power to investigate the cases referred to it, offer evidence, summon witnesses, and decide cases by a majority. Subdivision (c) of § 4 reads verbatim:

"In the event this Committee is unable to reach an agreement, it shall resort to the Conciliation Service to help the parties reach an agreement, except in those cases in which the parties decide not to use such Service. If the parties are still unable to reach an agreement, they shall designate by majority a fifth member alien to the parties, and any majority decision of this Committee so constituted shall be binding upon the parties."

Section 5 of art. XV provides that if an employee considers that his suspension or layoff is unjust, he may file a complaint with the Union, and the Union with the Company, which has the right to call the Grievance Committee to settle the matter. If in the opinion of the Grievance Committee the suspension or layoff is unjustified, the employee shall be reinstated without detriment to his seniority rights and recovery of whatever he may have failed to receive. Section 6 provides that any decision made within the procedure for settling complaints shall apply only to the complaint involved and shall not constitute a compulsory precedent for future claims, nor a binding precedent in the interpretation of the agreement.

Other provisions of the agreement which bear relation to the question at issue appear in art. XX relative to "seniority," which provides that the Company shall take into consideration all qualifications of the employee in case of promotions and layoffs, and that seniority shall prevail if there is equality of qualifications among the employees to be considered, but shall not be used against an employee who,

because of his ability, competence, efficiency and best record, is more useful than another who has merely been employed for a longer period. It is set forth in art. V that the parties recognize that this agreement contains all working conditions agreed upon and that they shall be the only working conditions which shall govern the relations between the parties. Article XIII establishes a union-shop system.

Article IV entitled "Rights Reserved to the Employer," which is basically applicable, provides as follows:

"Except as expressly limited by the terms of this Agreement, the Company retains and shall retain exclusive control of all matters concerning the operation, management, and administration of its business including, but without this being interpreted as a limitation, the administration and management of its departments and operations, the organization and working methods, the assigning of working hours, the management of the personnel, the right to employ, reclassify, transfer, discipline, suspend, lay off or pension employees, and all functions inherent in the administration and/or management of the business. The above-mentioned rights shall be used for economic and administrative purposes and not to discriminate against the Union or any of its members."

## BEFORE THE NATIONAL BOARD

As a result of charges filed by the Union against the Company on March 20, 1963, in the sense that it had and was engaged in unfair practices which affected commerce under the National Labor Relations Act, the National Board, after determining that the Telephone Co. was engaged in commerce under the provisions of the Federal Act, assumed jurisdiction and filed a complaint against the Company on August 15, 1963. It was alleged in the complaint that on November 8, 1962, the Company and the Union had signed a collective agreement which would expire in 1964; that the said agreement did not contain any provision for contracting with third persons work covered by the agreement; that

it contained a no-strike clause and a Grievance Committee for the discussion and settlement of complaints. That on different occasions, November 9, 16 and 23 and December 1, 1962, and March 8, 1963, the Company had contracted with others a substantial amount of work covered by the agreement without giving the Union on any of those occasions prenotice and an opportunity to bargain collectively such subcontracting, and that as a result of those acts it had laid off a considerable number of employees (about 157) up to March 9, 1963; that on March 14 the Union took up with the Grievance Committee the layoffs of March 8, and the Grievance Committee met on March 18 and the Union requested the Company to furnish certain information to enable it to continue the proceedings before the Committee, and that the request for information included: (1) volume of business transacted in January, February, and March 1963, as compared with November 1962 when the agreement was signed; (2) the income received by the Company from its volume of business; (3) the amounts saved by the Company as a result of the salaries of the employees laid off; (4) whether anyone was performing the work formerly done by the personnel laid off; and (5) how much the Company would save. It was alleged that the Company on that occasion and at all times refused to furnish this information.

It was further alleged that since November 13, 1962, the Union had objected to the Company's practice of contracting with third persons the work covered by the collective agreement and the termination of the employments, without giving the Union prenotice nor an opportunity to bargain respecting these actions, and that the Company had repeatedly refused, and still refuses, to cease such practices alleging that it had the right to contract unilaterally work with other persons and to terminate the employments without bargaining with the Union.

In view of the acts described, the Company was charged with engaging in unfair practices under § 8 (a) (1) and (5) and § 2 (6) and (7) of the National Labor Relations Act, on the ground that those acts substantially affected the commerce between the different states of the United States and between them and Puerto Rico, and tended to create labor disputes which hindered such commerce. Hearings of the complaint before the National Board were held on October 7 and November 6, 1963,* that is, prior to the issuing date —November 20, 1963—of the complaint by the Puerto Rico Board.

On the date of the hearing of this case before us, December 17, 1964, and on the date of final submission, January 28, 1965, the National Board had already settled the dispute on November 20, 1964. 149 N.L.R.B. No. 84, 57 L.R.R.M. 1397. Both because of the fact that we took judicial notice of the decisions of the National Labor Relations Board and the fact that the complaint before that Board forms part of the evidence in this petition and is an essential fact in the question of jurisdiction, we must take into consideration a fortiori the holding of the National Board as well as its findings of fact and conclusions of law in deciding the case.

The National Board has entered an all-embracing and broad decision on the issue without omitting any aspect. It held, first, that appellee Company comes squarely under its jurisdiction and it assumed plenary jurisdiction over the entire controversy. Second, that by its conduct in contracting or subcontracting with other parties work which was covered by the collective agreement without first bargaining with the Union, thereby giving rise to dismissals and layoffs of large groups of its employees which formed part of the contracting unit, the Company had engaged in unfair prac-

---

* 149 N.L.R.B. No. 84.

tices under the National Labor Relations Act. The Board rejected the Company's contention that it could contract with others part of the work and, consequently, to lay off the employees who formerly performed the same without submitting the matter to negotiation, invoking its management, administration, and direction of the business prerogatives under the employer's clause of the agreement (art. IV) and the provisions of art. V *supra*. It held that the Company was bound to negotiate first with the Union respecting such contracting, even if the agreement were silent on the matter and art. V provided that all the working conditions were those therein agreed upon, and that, therefore, the Company had and was engaged in an unfair practice in violation of § 8(a)(5) and (1) of the Federal Act.

In the third place, the National Board held that the Company had and was engaged in an unfair practice—refusal to bargain in good faith—by refusing to furnish the information requested by the Union in the course of the meetings before the Grievance Committee. It was of the opinion that the information requested was pertinent and necessary to enable the Union to intelligently evaluate and cope with the entire situation pending before the Grievance Committee concerning the mass layoffs and the unilateral contracting with third parties work covered by the agreement, and also that such information was necessary to enable the Union to discharge its legal responsibility in the administration of the collective agreement. The Board held, as against the opinion of the Company, that the Union's right to obtain that information did not depend on the terms of the agreement and was not of a contractual nature, but that it is a legal right flowing from § 8(d) of the National Act which does not depend on its inclusion in the collective agreement.[1]

---

[1] In this connection, the Board said in an affirmative statement of its jurisdiction and of its attitude not to waive the same that even though the Board some times permits that a question such as that above be

The National Board sets forth the fact that after the discussions of March 18 before the Grievance Committee without reaching an agreement, the Union petitioned for intervention of a conciliator, which the Company refused to do as being unnecessary. Thereupon the Union proposed to submit to arbitration the question of whether the intervention of a conciliator, as provided in the collective agreement, could be unilaterally requested by either party, or whether it should be requested by the full Grievance Committee; and regardless of the decision of the arbitrator on the foregoing, that the determination of whether the Company was bound to furnish evidence on the alleged economy invoked as ground for the layoffs should also be submitted. The Company did not answer this.

The National Board concluded that the Company's action in unilaterally subcontracting work was not due to discriminatory considerations against the Union employees, but solely to economic or business considerations, and that the subcontracts were motivated by an expansion program ordered by the Public Service Commission of Puerto Rico. This notwithstanding, the Board ordered the Company to cease from subcontracting unilaterally thereafter without bargaining with the Union and to bargain with the Union on the effects of such past subcontracts in the unit. It ruled that the layoffs resulting from those unfair practices were illegal, and ordered that all those employees who had been laid off as a result of such illegal conduct be reinstated and paid the salaries which they failed to receive.[2]

---

submitted to arbitration, such action was discretionary and that in this case it retained jurisdiction, first, because the question did not hinge on the interpretation of the contract, but that the right to have information was a right granted by law in favor of the Union, and, second, because the Company resisted the arbitration, and also that there existed the problem whether each party could unilaterally invoke the Conciliation Service.

[2] The Board set forth that the record did not expressly identify the employees affected by the subcontracting, and that perhaps the layoff of

The Board expressly ordered the Company to furnish the Union with any information and data necessary to assert its claim, and to permit it to discharge its statutory responsibility as representative of the Company employees. Lastly, it ordered the Company to cease and desist from such conduct and actions declared unfair practices by the Board.

## BEFORE THE PUERTO RICO BOARD

The hearing of the complaint filed before appellee Board was held on December 12, 1963. The Trial Examiner found that the Company had engaged in an unfair labor practice under § 8(1)(f) of the Puerto Rico Labor Relations Act by violating the collective agreement—refusing to use the Conciliation Service—and recommended that the Puerto Rico Telephone Co. be ordered to take the following affirmative action: To meet with the Grievance Committee to discuss the cases submitted by 43 employees of the Company who alleged that the latter had laid them off, and to permit an officer of the Conciliation and Arbitration Bureau of the Labor Department to participate in the negotiations of the Grievance Committee. The Board issued an order to take the affirmative action recommended by the Trial Examiner.

It appears from the record that the Company and the Union representatives in the Grievance Committee had been considering the entire situation created by the mass layoffs of Company employees as a result of the subcontracted work, as well as the question of the requested information.[3] We have before us in this case the stenographic notes of the proceedings had at the meetings held on October 1, 2 and 4,

some of the 227 employees did not bear relation to such contracts, and left the question for determination in subsequent proceedings on performance of its decision.

[3] From the decision of the National Board it also appears that the conversations commenced on November 15, 1962, and thereafter continued frequently and periodically during 1963.

1963, before the Grievance Committee. At these meetings the position assumed by the Company was identical with that assumed in the proceedings before the National Board. It insisted on not discussing the general question of layoffs resulting from the subcontracting. It maintained that the Committee was without power to take cognizance of that matter, pursuant to the definition of "complaint" of art. XV —a claim by an employee of the violation of the contractual provisions of the agreement—alleging that subcontracting is a management prerogative under art. XV which did not violate any agreement, and this being so, the Committee lacked authority, under the provisions of § 4 (f) of art. XV, "to alter, amend, modify, add or detract from the provisions" of the agreement.

The Union announced that it proposed to take up the complaints of 45 employees who had been laid off since September 1, 1963, and to that effect it requested the Company in the Committee the following information:

1. Volume of business of the Telephone Company during the months of November and December 1962; January, February, March, April, May, June, July, August and September 1963.

2. Profits realized by the Company from the volume of business, computed on a monthly basis.

3. Amounts saved by the Company from the salaries which were not paid to the laidoff employees.

4. Who is performing the work formerly performed by the laidoff personnel.

5. What amount the Company saves on this account.

6. Specific reason for each layoff, stating clearly the reason therefor.

7. How many subcontracts has the Company made since November and up to the present.

8. Value and expenses incurred by the Company as a result of these subcontracts; in other words, the cost of these subcontracts.

9. Type of work subcontracted.

10. Employees who have commenced to work for the Company since November 1962, by departments, namely, the new employees.

11. "Part time" employees of the Company, by departments.

12. Overtime worked by the enterprise since November and up to the present, computed on a monthly basis and also by departments.

13. How many have been pensioned, their ages, names and amount of pension.

The Company refused to furnish the information in general form for the same reasons already stated which it adduced before the National Board and in the Grievance Committee. It admitted, however, that a problem of violation of the contract by reason of the violation of the "seniority" clause could be involved in the complaints of the employees laid off, and was willing at all times to consider that aspect in each case. It was also willing, upon hearing each complaint separately, to furnish the information requested under No. 6, namely, the specific reason for the layoff in each particular case, as well as any other information appertaining to each individual employee.

In view of this state of affairs, the parties agreed to hear each layoff separately in the light of its circumstances, and the case of one of the employees was called and the Company furnished the information on the reason for his dismissal. However, the hearing of the case did not prosper because the Union insisted, before proceeding further, that all the general information of an economic character requested should be furnished. The Company was willing to furnish it if pertinent in the case. As a result of that situation, an absolute disagreement arose in the Grievance Committee, not on the merits of the matter, but on the manner itself of how to hear each case. Thereupon the Union requested that the Conciliation Service be used. The company's position was to the effect that since no disagreement had arisen on the

merits of the complaint since it had not yet been heard on the merits, the intervention of the Conciliation Service was premature. The proceedings had before the Committee on October 1, 2, and 4, 1963, terminated in those circumstances. Thereupon the Union charged the Company before the Labor Relations Board with a violation of the agreement by refusing to resort to the Conciliation Service.

## The Question of Jurisdiction

In view of the foregoing statement of facts, it is unquestionable that the attitude and position of the Union and of the Company, respectively, in the Grievance Committee in the course of the proceedings of October 1, 2, and 4, 1963, which gave rise to this petition, is not different at all from their attitude and position assumed in the proceedings before the National Board, and that the question at issue was the same: the Company's policy of subcontracting work and the inevitable loss of employment for that reason. The record shows that the Union was not interested so much in elucidating in the Committee proceedings of October 1, 2, and 4 the reason for a particular layoff or the possible violation of the "seniority" clause among the employees laid off or other purely personal reasons, but in considering the general problem involved respecting the Company's policy of subcontracting work, thereby creating unemployment. This problem, of which the furnishing of information was a logical by-product, was already under the consideration of the National Board in all its aspects and consequences, which agency had assumed full jurisdiction. In view of the Union's attitude at the October meetings, there is no explanation, and the record offers none, why the controversy on the layoff of those 45 employees, which the Union itself attributed in the record to the same considerations of the layoffs until March—the subcontracting—was not raised before the National Board which was already taking cognizance of the matter, and,

on the contrary, it was sought to submit it to a local conciliator who, under the stated circumstances, could do very little or nothing effective because the case was pending before that Board, thereby inviting clash of jurisdiction respecting an enterprise which comes squarely under the federal legislation. An illustration of what has been said is the fact that at this moment, after the National Board has decided everything concerning the validity of the unilateral contracting and its consequences—the layoffs—the affirmative action which the Board ordered appellee to take in the sense of using the Conciliation Service under the agreement to entertain a controversy already adjudicated in law, would not serve any practical purpose. And if a conciliator should intervene even as respects this group of employees in particular, he could not do or recommend anything against the decision of a competent authority.

The Company invoked this conflict of jurisdiction before the Board. The Trial Examiner comments on this point:

"It is possible that the employer's contention may eventually prevail. We have recently said that the ever-changing rhythm of the labor-management relations in Puerto Rico speeds up the moment when an inevitable clash will occur between the exercise of jurisdiction of the National Labor Relations Board and an identical activity of the Puerto Rico Labor Relations Board."

It is an unquestionable fact that the exercise of authority gives rise to conflicts of jurisdiction between the National Board and the State Boards where such boards exist, or with the state courts, and even within the same federal area between the National Board and the district courts. Such conflict of jurisdiction will bequeath to the future incalculable judicial gloss on all levels of expression. It would be superfluous to cite or analyze decisions which are so well known in this branch of the law.

■ Puerto Rico cannot evade such a situation. Although special circumstances of its life as a people and of its economy perhaps present also special considerations respecting the federal intervention in its labor relations, the problem is for the high political spheres charged with determining the federal relations of the United States with Puerto Rico. In the meantime, and until such time as those relations are altered or modified by the competent political agencies, we do not believe that the clash or conflict of authority between the National Board and the Puerto Rico Board will always, necessarily and inevitably, occur. It may and should be prevented there where the circumstances show that it is not necessary for such clash to occur if a good discernment is applied. It is not advisable either to invite a clash of jurisdiction, if it can be prevented, in an undesirable struggle of authority or of duplicity of action with the consequent superfluous waste of energies and time and inevitable confusion.

Here the authority of the National Board over the activity of the Telephone Co., an interstate business enterprise, was not debatable or merely conceivable under the ruling of *Garmon*, but it was a clear authority, free from doubt, in the light of the facts involved.[4] Moreover, the Board did not relinquish or waive its jurisdiction but, on the contrary, had exercised it fully.

We are aware that the Board's jurisdiction has been invoked on the basis of a violation of the collective agreement. Already since *Labor Relations Board* v. *I.L.A.*, 73 P.R.R. 568, decided in 1952, we held that since the violation of the clauses of a collective agreement is not protected by

---

[4] *San Diego Unions* v. *Garmon*, 359 U.S. 236.

See: *Plumber's Union* v. *Borden*, 373 U.S. 690; *Liner* v. *Jafco Co.*, 375 U.S. 301; *Humphrey* v. *Moore*, 375 U.S. 335; *Guss* v. *Utah Labor Board*, 359 U.S. 1. *Cf. Carey* v. *Westinghouse Corp.*, 375 U.S. 261; *Smith* v. *Evening News Ass.*, 371 U.S. 195.

the federal legislation before the National Labor Relations Board (a remedy is granted in the district courts, 61 Stat. 156, § 301), and, on the other hand, since the violation has been declared an unfair practice under our legislation, the Puerto Rico Board had authority to intervene in such violation of the agreement even in the case of entities engaged in interstate commerce which are covered by the National Labor Relations Act. Any effect which the subsequent decision of *Guss* v. *Utah Labor Board*, 353 U.S. 1, decided in 1957, could have had on our decision in the *I.L.A.* case, could have also been neutralized by the subsequent action of Congress in amending in 1959 —Landrum-Griffin Act— § 14 of the Taft-Hartley Act of 1947. See, also, *Puerto Rico Telephone Co.* v. *Labor Relations Board*, review No. 74, 86 P.R.R. 362 (1962), and the exposition of jurisdictional norms in *Labor Relations Board* v. *Milares Realty, Inc.*, 90 P.R.R. 821 (1964).

The Board relies vigorously on the decision of November 5, 1962, cited above. Apart from the fact that the ruling at this time is not in conflict with that decision, there is a clear distinction, for the purposes of the applicable norms, between the facts and the situation in petition No. 74█ and those of this petition. That case involved the layoff of an employee for purely personal questions. She took up the matter before the Grievance Committee and afterwards before the Board, and also before the National Board. The National Board forthwith declined to intervene or to assume jurisdiction. It seems clear that the National Board did not see in that layoff any problem affecting commerce, unlike its conclusion on the prejudicial effect on commerce of the layoffs in this case. Hence, the contention of jurisdictional conflict which the Company first made before the Board in the former petition No. 74 and which it insisted on main-

taining before us on review, actually was without basis since no conflict of jurisdiction actually existed.

■ Even it it were true that appellee Board had power in law to intervene in a charge of violation of the agreement in refusing to resort to the Conciliation Service, the facts in the record showed that the alleged violation was a minor incident which was part and parcel of the basic problem involved which was under the National Board's consideration. Under those circumstances and even if the power existed, it seems to us that it was a better norm that the Board refrain from exercising it in the use of the sound discretion with which it is invested as a tutelary agency of labor relations.

## THE QUESTION ON THE MERITS

In view of the fact that appellee Board exercised jurisdiction even though on a limited or residual aspect within the general problem involved, we consider the question on the merits of such aspect.

In its Decision and Order the Board stated as follows:

"The employer maintains that the determination on the appropriateness of the Union's demand before the Grievance Committee was necessary and previous to any determination on the charge of violation of the agreement in the present case. In his report the Trial Examiner made no ruling on this point. We subscribe to the Trial Examiner's position on the ground that such ruling was immaterial for the purposes of establishing the violation of the agreement charged to appellee. The reasons, *merits* or *causes* which appellee had not to comply with the obligation assumed to bargain collectively with complainant § 4(c) of art. XV of the collective agreement, are not within the province of the Board in the case at bar." (Italics ours.)

■ In this petition the Company has challenged the foregoing conclusion, in our judgment, correctly. It was charged with a violation of the agreement in refusing to resort to

the Conciliation Service which the Union wanted to use. The controversy turned precisely on the propriety or not of such Service at that stage when there was no disagreement yet between the parties on the merits of the complaint in question. The Company maintained that the intervention was premature, according to its interpretation of art. XV. There also existed the problem of interpretation of § 4(c) of art. XV as to whether one of the parties in the Grievance Committee could unilaterally obligate the other to use such Service, or whether the same had to be used with the consent of both. From the foregoing conflicting criteria on the interpretation of the agreement respecting that point it may not be said that those of either party were wholly frivolous or without *merit*. Since the disagreement arose which authorizes the use of the Conciliation Service, precisely as to its use, it was necessary for the parties, by arbitration, or for the appellee Board, by the interpretation of the agreement in the light of the facts, to decide first that the use of the Conciliation Service was proper at the stage it was required by the Union, and that it was proper only at the request of one of the parties in the Grievance Committee in order that the final conclusion of violation of the agreement by the Company may be upheld. The error of considering such determinations immaterial, core of the issue, and that they were not within the province of the Board, warrants our setting aside the order appealed from.

As already stated, the disagreement between the parties concerning the furnishing of information was already settled by the National Board as a right granted to the Union by the Federal Act, independently of the agreement. The controversy on the validity of the layoffs as a result of the subcontracting and on the power of the Company to subcontract work unilaterally is also settled. As stated above, the Order of the Board to seek the intervention of a conciliator to help the parties decide the controversy already settled had no

practical purpose. However, there may exist problems of seniority in connection with the layoffs involved, or that the layoffs were due to other reasons.[5]

In view of the foregoing circumstances, the Decision and Order of appellee Board will be set aside, with instructions to remand the matter to the Grievance Committee to consider the merits of the complaints by reason of layoffs regarding any point which may not have been adjudicated already, and if there be any disagreement as to the use of the Conciliation Service on any matter which may not have been decided, to submit preferably the disagreement to arbitration, since the same involves the interpretation of the agreement itself. Judgment shall be rendered accordingly.

---

[5] The record before us, like that before the National Board, does not enable us to ascertain that all the layoffs object of this proceeding were due to the subcontracting.